HAROLD DAVIS, Administrator of the Estate of Phillip Davis, Plaintiff v. NORTH CAROLINA DEPARTMENT OF HUMAN RESOURCES, Defendant

No. COA95-190

(Filed 19 December 1995)

1. **State § 46 (NCI4th)— death caused by former mental health patient—negligent employee not specifically named**

In an action under the Tort Claims Act to recover damages for injuries occurring when a patient was released from Cherry Hospital where he had been involuntarily committed and the patient subsequently killed plaintiff's intestate, the claim was not subject to dismissal on the ground that plaintiff's affidavit failed to include "the name of the State employee upon whose alleged negligence the claim is based" as required by N.C.G.S. § 143-297(2) because it failed to name the patient's treating physician who recommended his release where plaintiff listed the "North Carolina Department of Human Resources, Division of Mental Health, Cherry Hospital, Thomas E. Buie, Jr., M.D., Director of Clinical Services" as the state agency and employee alleged to be negligent; plaintiff's affidavit gave sufficient notice to defendant to allow it to narrow its investigation to those involved with treating the patient; at no time did defendant indicate that it was hampered in its investigation; and the object of the statute was achieved.

**Am Jur 2d, Municipal, County, School, and State Tort Liability §§ 661 et seq.**

2. **Hospitals and Medical Facilities or Institutions § 65 (NCI4th)— mental health patient—duty of defendant to exercise reasonable care to protect third parties, to advise district court**

Where a mentally ill patient was involuntarily committed into the custody of a state institution, the institution had a duty to exercise reasonable care in the protection of third parties from injury by the patient, and this duty necessarily mandated the exercise of reasonable care in the advice given the district court with regard to the appropriateness of mental health commitment.

**Am Jur 2d, Hospitals and Asylums §§ 14, 16.5, 19-25.**

**3. Physicians, Surgeons, and Other Health Care Professionals § 123 (NCI4th)— release of mental patient—failure of examining psychiatrist to exercise reasonable care**

In an action to recover damages for the death of plaintiff's intestate who was killed by a patient who had been released from Cherry Hospital, the evidence was sufficient to support the Industrial Commission's finding that the examining psychiatrist failed to exercise reasonable care in his recommendation given the district court with regard to the appropriateness of mental health commitment where the evidence tended to show that the psychiatrist was aware of the patient's violent history, of his failure to take medication in the past, and of the fact that failure to take medication led to violent behavior.

**Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 357 et seq.**

**4. Hospitals and Medical Facilities or Institutions § 65 (NCI4th)— former mental patient—violent acts in recent past—same as relevant past—relevant past as six months preceding hearing**

In an action to recover damages for the death of plaintiff's intestate who was killed by a patient who had been released from Cherry Hospital, there was no merit to defendant's contention that the patient had not committed any violent acts within two months of the district court hearing and therefore was not, as a matter of law, dangerous to others within the meaning of N.C.G.S. § 122-58.2(1)(b), since the term "recent past" as used in that statute means "relevant past," and violent acts committed within six months prior to the hearing occurred within the relevant past.

**Am Jur 2d, Hospitals and Asylums §§ 38, 44.**

**5. Hospitals and Medical Facilities or Institutions § 65 (NCI4th); Negligence § 22 (NCI4th)— death caused by former mental patient—release as negligence—no intervening negligence**

In an action to recover damages for the death of plaintiff's intestate who was killed by a patient who had been released from Cherry Hospital, there was no merit to defendant's contention that its actions were not the proximate cause of the death because there were intervening acts, since the evidence was such that the Commission could determine that defendant could have

reasonably foreseen the subsequent acts and the resultant harm to plaintiff's intestate.

**Am Jur 2d, Hospitals and Asylums §§ 38, 44; Negligence §§ 492-501.**

Judge Mark D. MARTIN concurring.

Appeal by defendant from Decision and Order for the Full Commission entered 14 November 1994. Heard in the Court of Appeals 14 November 1995.

*Duke & Brown, by John E. Duke, and Jonathan S. Williams, for plaintiff-appellee.*

*Attorney General Michael F. Easley, by Assistant Attorney General William H. Borden, for defendant-appellant North Carolina Department of Human Resources.*

GREENE, Judge.

The North Carolina Department of Human Resources (defendant) appeals a Decision and Order of the North Carolina Industrial Commission (Commission), awarding Harold Davis (plaintiff), as administrator of the estate of Phillip Davis (Davis), damages for injuries occurring when Dondiago Rivers (Rivers) was released from Cherry Hospital where he had been involuntarily committed, and subsequently killed Davis.

Rivers had been committed to state mental hospitals on eleven separate occasions. He had a history of aggressive, hostile behavior, and had been previously convicted for shoplifting, damage to personal property, assault on a female, trespassing and communicating threats. On 17 February 1982, Rivers pled guilty and was sentenced to six years in prison for voluntary manslaughter, after he beat a man's head against a sidewalk until the man died. On 2 October 1984, Rivers was arrested for assault on a female and carrying a concealed weapon, after he chased after his victim with a knife in hand.

By Order dated 19 October 1984, the trial court found that Rivers was incapable to stand trial, and should be involuntarily committed pursuant to N.C. Gen. Stat. § 15A-1003. On 25 October 1984, the court found Rivers mentally ill and dangerous to others and involuntarily committed him to Cherry Hospital for 30 days. Rivers was reevalu-

ated and on 15 November 1984 was recommitted to Cherry Hospital for another 180 days.

While at Cherry Hospital, Rivers got into fights, and threatened patients and staff members. He was transferred to the "high management" unit because of his fighting and anti-social behavior. Rivers was sent back to the behavior modification unit on 20 February 1985, where Dr. Perumallu saw Rivers on a weekly basis. Rivers was treated with medication to stabilize his behavior and showed improvement over the next two months. A report by Dr. Perumallu prepared 26 April 1985 stated that for the previous two months Rivers had not shown "any physical and verbal aggressive behavior" and recommended that Rivers was ready to stand trial at this time and "does not meet the criteria for commitment."

At the hearing to determine whether Rivers should be discharged to stand trial, Dr. Perumallu testified that Rivers was responding well to medication, was not a threat or danger to others, but due to his drug and alcohol problems or if he stops taking the medication, which lead to his mental and behavioral problems, he should be supervised upon being released from the hospital. Dr. Perumallu wrote in his discharge report, made only days after the release hearing, that "[i]n view of the past violence and his inability to understand his illness, inability to take medications, stress and at times taking marijuana and alcohol, even though patient denies the problems, all these factors" may cause a "crisis of violence" and "dangerousness in the community." Dr. Perumallu's prognosis for Rivers was "very guarded . . . in view of . . . his . . . stress situations, [and] altered mental state functionings."

Although Rivers was found mentally ill, he was not found to meet the criteria for commitment, and was ordered discharged from Cherry Hospital by Judge Arnold Jones, the District Court Judge presiding, who had previous knowledge of Rivers' mental state and aggressive behavior from Rivers many times in court on other charges as well as a similar commitment hearing in 1978.

Upon discharge, Rivers was released into the custody of the Wayne County Sheriff's Department. He was then evaluated at Dorothea Dix Hospital by Dr. Groce, who gave the opinion that at times Rivers was not able to tell right from wrong, and recommended that Rivers was "capable of proceeding to trial," but stated that whether he is found not guilty due to insanity or guilty, he should con-

DAVIS v. N.C. DEPT. OF HUMAN RESOURCES

[121 N.C. App. 105 (1995)]

tinue receiving treatment. Dr. Groce found that Rivers "may continue to present a danger to himself or to other people in the community."

Rivers was discharged to the Sheriff's Department with a two-week supply of medication, and a weekly follow-up plan for individual therapy at the Wayne Mental Health Center.

On 5 June 1985 Rivers pled guilty to assault on a female and carrying a concealed weapon. District Court Judge Joseph Setzer, who had once prosecuted Rivers on voluntary manslaughter, sentenced Rivers to two years in prison, but suspended it for three years, with two years of supervised probation.

On 18 August 1985, Davis was with two friends in Goldsboro. Rivers walked across an intersection in front of Davis' car pointing at the car and saying something that could not be heard. Davis got out of the car, went to the trunk and got a "tire tool," at which time Rivers ran off. Two blocks down the road, Davis and his friends stopped at a club to buy some beer. While Davis was walking back to the car, Rivers ran up from behind and hit Davis on the head with a fence post, fracturing Davis' skull and killing him.

Plaintiff brought suit before the Commission, pursuant to the North Carolina Tort Claims Act, alleging negligence by the State for releasing Rivers from Cherry Hospital when it knew or should have known that Rivers was violent and dangerous to others.

Plaintiff's affidavit, filed with the Commission pursuant to N.C. Gen. Stat. § 143-297, listed the "North Carolina Department of Human Resources, Division of Mental Health, Cherry Hospital, Thomas E. Buie, Jr., M.D., Director of Clinical Services" as the name of the department, institution or agency of the state against which the claim is asserted and the name of the state employee who was alleged to be negligent. The affidavit's statement of facts states in part that "prior to August of 1985, one Dondiago Rivers was a patient at Cherry Hospital, and has been a mental patient at Cherry Hospital for sometime . . . ; that the said department, acting by and through Thomas E. Buie, Jr., negligently caused Dondiago Rivers to be released in a violent state to his home county of Wayne County, North Carolina."

Dr. Malekpour, an expert in the field of psychiatry who had cared for Rivers at another facility, testified before the Commission that a reasonable standard of care required a report to the court that Rivers was "highly dangerous" and a person "who needed to be confined in one form or the other."

Defendant's motion for summary judgment was denied. The Commission found that as Rivers' treating physician, Dr. Perumallu

> was under a duty to exercise reasonable care in his treatment of Rivers in preparation for release to stand trial and more importantly in his recommendations to the court, who would rely thereon in determining whether Rivers was dangerous to himself or others. This duty extends to those in the community who might come to harm at the hands of Rivers if released when dangerous to himself or others.

> 15. Dr. Perumallu breached the above-described duty owed to Phillip Davis and others when he reported to the court that Rivers was not dangerous to himself or others. . . . Judge Jones relied on Dr. Perumallu's recommendation that Rivers was not dangerous and the end result was that Rivers was released and committed murder again . . . . Dr. Perumallu knew or should have known that Dondiego [sic] Rivers did not have a structured environment outside of the hospital and was not likely to take his medication as prescribed. Dr. Perumallu knew or should have known that while Rivers may have stabilized for a few months, he was likely to go off his medication, decompensate quickly, and likewise quickly become a danger to the community. The fact that it was Judge Jones who made the ultimate decision or that Dr. Perumallu may have assumed Rivers was going back into the criminal justice system and would hopefully receive an appropriate disposition there is irrelevant. . . .

> . . . .

> 17. Dr. Perumallu's breach was the proximate cause of Phillip Davis' death. It was reasonably foreseeable that Rivers if released would harm or murder someone else.

Plaintiff was awarded $100,000 for damages. Defendant appeals.

---

The issues are whether (I) the award should be dismissed because the affidavit does not name the negligent employee responsible for Davis' death; and (II) the evidence was sufficient to find negligence by the defendant, causing Davis' death.

I

**[1]** Defendant argues that plaintiff failed to include in his affidavit "the name of the State employee upon whose alleged negligence the

claim is based." N.C.G.S. § 143-297(2) (1993). Plaintiff's affidavit stating its claim against the State, filed with the Commission, listed "Thomas E. Buie, Jr., M.D., Director of Clinical Services" at Cherry Hospital, as the negligent employee. Defendant contends that "the evidence does not tend to show that Dr. Buie was negligent or involved in the release of Mr. Rivers," but focuses on Dr. Perumallu's negligence, who was not added to the affidavit, and therefore "this claim against the defendant should be dismissed."

The purpose of requiring a claimant to name the negligent employee of the State agency is to enable the agency to investigate the employee involved and not all employees. *Distributors, Inc. v. Dept. of Transp.*, 41 N.C. App. 548, 551, 255 S.E.2d 203, 206, *cert. denied*, 298 N.C. 567, 261 S.E.2d 123 (1979). Furthermore, although the Tort Claims Act is strictly construed, the rule of strict construction should not be replaced by one of "technical stringency." *Id.* at 550, 255 S.E.2d at 205 (holding that although affidavit named only one negligent employee of defendant, while two were involved, it gave sufficient notice of which employee or employees was/were involved so that defendant could properly confine its investigation); *see Laughinghouse v. State ex rel. Ports Ry. Comm'n*, 101 N.C. App. 375, 377, 399 S.E.2d 587, 589 (1991) (claim dismissed because negligent employees were employees of State Ports Authority, not the Ports Authority Railway Commission, as named in the affidavit).

Plaintiff's affidavit gave sufficient notice to defendant to allow it to narrow its investigation to those involved with treating Rivers. The affidavit notified defendant that Davis' death was caused by a former patient, Rivers, who had been involuntarily committed to Cherry Hospital. Plaintiff named the correct state agency, as required by section 143-297, the specific division of that agency, as well as the hospital at which Rivers was committed and where the alleged negligence took place. At no time did defendant indicate that it was hampered in its investigation. Failure to name Dr. Perumallu, therefore, did not impede defendant's investigation, and the objective of section 143-297 was achieved.

II

Defendant also contends that Dr. Perumallu did not breach any duty to Davis and that even if he did, that the breach was not a proximate cause of Davis' death. We disagree.

The elements of a cause of action based on negligence are: a duty, breach of that duty, a causal connection between the conduct and the injury and actual loss. W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 30, at 164-65 (5th ed. 1984) [hereinafter *Prosser and Keeton on Torts*]. A duty is defined as an "obligation, recognized by the law, requiring the person to conform to a certain standard of conduct, for the protection of others against unreasonable risks." *Id.* A breach of the duty occurs when the person fails to "conform to the standard required." *Id.* "Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred." *Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984). The injurious result must have been reasonably foreseeable by a "person of ordinary prudence," although the defendant need not have foreseen the precise form of the injury. *Id.* at 233-34, 311 S.E.2d at 565. He need only have foreseen that some injury would result. *Id.* at 234, 311 S.E.2d at 565. There may be more than one proximate cause of an injury. *Id.* When there is more than one proximate cause, each negligent actor may be held liable for the injuries. *Id.*

## A

### DUTY

[2] The general rule is that there is no duty to protect others against harm from third persons. *King v. Durham County Mental Health Auth.*, 113 N.C. App. 341, 345, 439 S.E.2d 771, 774, *disc. rev. denied*, 336 N.C. 316, 445 S.E.2d 396 (1994). A recognized exception, however, exists where a person has been involuntarily committed for a mental illness, in which case there is a duty on the institution to exercise control over the patient "with such reasonable care as to prevent harm to others at the hands of the patient." *Pangburn v. Saad*, 73 N.C. App. 336, 338, 326 S.E.2d 365, 367 (1985); *see King* at 345-46, 439 S.E.2d at 774; *see also Currie v. United States*, 836 F.2d 209, 212-13 (4th Cir. 1987) (*citing Pangburn*). We reject the defendant's argument that its conduct must be measured "in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities." N.C.G.S. § 90-21.12 (1993). The section 90-21.12 standard of care is only applicable to medical malpractice actions, *id.*, and a recommendation given a district court with regard to involuntary commitment or the capacity of a defendant to proceed is not a medical

malpractice action. *See Pangburn*, 73 N.C. App. at 338, 326 S.E.2d at 367 *(citing Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 203, 296 S.E.2d 693, 696-97 (1982)); N.C.G.S. § 90-21.11 (1993) (defining medical malpractice action as one arising "out of the furnishing or failure to furnish professional services in the performance of medical . . . care by a health care provider").

In this case, Rivers was involuntarily committed into defendant's custody and it, therefore, had a duty to exercise reasonable care in the protection of third parties from injury by Rivers. This duty necessarily mandates the exercise of reasonable care in the advice given the district court with regard to the appropriateness of mental health commitment. *See Hicks v. United States*, 511 F.2d 407, 415 (D.C. Cir. 1975) (public mental hospital owed duty to court to provide report as to defendant's ability to stand trial and also to a subsequent victim of defendant).

## B

### BREACH

The defendant makes two separate arguments that the record does not support a finding that it breached its duty. We disagree with both.

### *Lack of Evidence*

[3] The defendant first argues that there is insufficient evidence to support the finding that Dr. Perumallu failed to exercise reasonable care in the recommendation given the district court with regard to the appropriateness of mental health commitment. In reviewing whether the findings are supported by the evidence, we are bound by the findings of the Commission if they are supported by sufficient competent evidence in the record. *Andrews v. Fulcher Tire Sales and Service*, 120 N.C. App. 602, 605, 463 S.E.2d 425, 427 (1995). The evidence is sufficient if a reasonable mind might accept it as adequate to support the finding. *Andrews*, 120 N.C. App. at 605, 463 S.E.2d at 427.

Dr. Perumallu's report prepared for the district court stated that Rivers was mentally ill but did not meet the criteria for commitment because Rivers was not dangerous to others. At the time of the report he was aware of Rivers' violent history and that Rivers had failed to take his medication in the past, which was one factor leading to his violent behavior. Dr. Perumallu wrote in his discharge report, made only days after the release hearing, that "[i]n view of the past violence

and his inability to understand his illness, inability to take medications, stress and at times taking marijuana and alcohol, even though patient denies the problems, all these factors" may cause a "crisis of violence" and "dangerousness in the community." Dr. Perumallu's prognosis, in his discharge report, was "very guarded . . . in view of . . . his . . . stress situations, [and] altered mental state functionings." Dr. Malekpour, an expert in the field of psychiatry who had cared for Rivers at another facility, testified that a reasonable standard of care required that the treating psychiatrist report to the court that Rivers was "highly dangerous" and "needed to be confined in one form or the other."

This evidence is both competent and sufficient to support the findings of the Commission that the defendant breached its duty of exercising reasonable care in the advice given to the district court.

*Matter of Law*

[4] The defendant next argues that because Rivers had not committed any violent acts within two months of the district court hearing, he was not, as a matter of law, "dangerous to others" within the meaning of former N.C. Gen. Stat. § 122-58.2(1)b. 1979 N.C. Sess. Laws ch. 915, § 1 (codified as N.C.G.S. § 122-58.2(1)b) (repealed 1986). It follows, the defendant contends, that Dr. Perumallu's testimony was correct and not in breach of any duty. We disagree. "Dangerous to others" is defined to mean:

> that **within the recent past**, the person has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another or has acted in such a manner as to create a substantial risk of serious bodily harm to another, and that there is a reasonable probability that such conduct will be repeated.

*Id.* (emphasis added). Although the evidence is that Rivers, within two months prior to the hearing, had not exhibited any acts of violence or threats, there were violent acts prior to that two month period.

The question is whether the two months proceeding the district court hearing is the "recent past" or whether the "recent past" extends back beyond those two months. The legislature did not define the term, choosing instead to leave the issue ambiguous. The legislature did in 1985, delete the term "recent past" and substitute the term "relevant past." N.C.G.S. § 122C-3(11)b (1993). We construe this legislative amendment as an effort on the part of the legislature

**DAVIS v. N.C. DEPT. OF HUMAN RESOURCES**

[121 N.C. App. 105 (1995)]

to clarify the meaning of the statute, not to change the law. *See Childers v. Parker's, Inc.*, 274 N.C. 256, 260, 162 S.E.2d 481, 483-84 (1968). We therefore construe the term "recent past" to mean "relevant past" and as such determine that the violent acts committed by Rivers within the six months prior to the district court hearing to be the "relevant past." These acts are relevant because they occurred close enough in time to the district court hearing to have probative value on the ultimate question before the court of whether there was a "reasonable probability that such [violent] conduct [would] be repeated." 1979 N.C. Sess. Laws ch. 915, § 1; *see* N.C.G.S. § 8C-1, Rule 401 (1992) (defining relevant evidence). We do not attempt to define the term with any greater degree of preciseness and each case must be viewed on its own facts in determining whether violent acts are relevant to the inquiry of involuntary commitment. The courts will be the ultimate judge of whether the conduct occurs within a relevant time.

C

PROXIMATE CAUSE

[5]  Defendant argues that its actions were not the proximate cause of Davis' death and plaintiff's injuries, because "[t]here are too many intervening events and intentional acts by others." We disagree.

Defendant argues that there are four separate intervening acts which would supersede any negligent action by Dr. Perumallu. First, at the commitment trial, despite testimony by Dr. Perumallu about Rivers' "anti-social personality . . . which would tend to emerge under the stress caused by alcohol, drugs, arguments, or stopping pre-scribed medications," and Judge Jones familiarity with Rivers' repu-tation for violence, Judge Jones found Rivers did not meet the crite-ria for commitment. Defendant argues that the sole proximate cause of the release of Rivers was the "determination by Judge Jones that the State had failed to carry it's [sic] burden of proving by clear, cogent, and convincing evidence that he was mentally ill and danger-ous to himself and others."

Second, Rivers was released into the custody of the sheriff, at which point Dr. Groce determined that Rivers was stabilized and ready to stand trial. Third, Judge Setzer found Rivers competent to stand trial and "gave Rivers his freedom" when he suspended his sen-tence. Finally, over a month after Rivers' trial, "Davis left his car and . . . trigger[ed] the events leading to his death."

"In order for the conduct of the intervening agent to break the sequence of events and stay the operative force of the negligence of the original wrongdoer, the intervening conduct must be of such nature and kind that the original wrongdoer had no reasonable ground to anticipate it." *Hairston*, 310 N.C. at 237, 311 S.E.2d at 567. Except "in cases so clear that there can be no two opinions among men of fair minds," the question of whether the original wrongdoer had a reasonable ground to anticipate the intervening conduct is a question for the fact finder. *Id.* at 238, 311 S.E.2d at 567. In this case, the evidence is such that the Commission could determine that the defendant could have reasonably foreseen the subsequent acts and the resultant harm to Davis. Because there is evidence to support that determination, we are bound to accept the finding that the defendant's breach was the proximate cause of the death.[1]

Affirmed.

Judge McGEE concurs.

Judge MARTIN, Mark D., concurs with separate opinion.

Judge MARTIN, Mark D., concurring.

I write separately to emphasize the need for the appellate division to articulate a consistent standard of review when considering the Commission's factual findings. Compare *Andrews v. Fulcher Tire Sales and Service*, 120 N.C. App. 602, 605, 463 S.E.2d 425, 427 (1995) (this Court bound by Commission's findings if supported by "sufficient competent evidence") with *Strickland v. Carolina Classics Catfish, Inc.*, 119 N.C. App. 97, 102, 458 S.E.2d 10, 13 (1995) (this Court's review limited to determination of whether Commission's findings are supported by "any competent evidence"). The majority opinion follows the standard of review articulated in *Andrews v. Fulcher, supra*, and concludes there is <u>sufficient</u> competent evidence to uphold the Commission's findings. Because I believe the Commission's findings should be affirmed whether reviewed under the "any competent evidence" standard, or, alternatively, the "sufficient competent evidence" standard, I concur in the majority opinion.

---

1. It may be that because there is no evidence that the intervening acts in this case were negligent or culpable, they cannot insulate the defendant from its negligent conduct. *See Balcum v. Johnson*, 177 N.C. 213, 216, 98 S.E. 532, 534 (1919) ("usually the [intervening] act must be in itself negligent, or at least culpable"); *see also Prosser and Keeton on Torts* § 44 (discussing intervening causes). Because we have decided that the evidence can support a finding that the intervening acts were foreseeable, we need not reach the additional issue of whether those acts must be negligent or culpable. In any event, this issue was not argued by the parties.