IN THE MATTER OF: MICHAEL CHARLES HAYES

No. COA99-537

(Filed 18 July 2000)

### 1. Mental Illness— criminal defendant found insane—recommitment—definition of mentally ill

In a recommitment hearing for a respondent found not guilty by reason of insanity of multiple counts of murder and assault, the definition of "mentally ill" applied by the trial court was not unconstitutionally vague. N.C.G.S. § 122C-3(21).

### 2. Mental Illness— criminal defendant found insane—recommitment—personality disorder

In a recommitment proceeding for a respondent who had been found not guilty of multiple murders and assaults by reason of insanity, the trial court did not err by concluding as a matter of law that respondent had failed to meet his burden of proof and again ordering his return to confinement at the Dorothea Dix state mental health facility. Although respondent argued that he can no longer be classified as mentally ill under *Foucha v.*

*Louisiana,* 504 U.S. 71, that case did not define mental illness and respondent did not challenge N.C.G.S. § 122C-3(21)'s definition of mental illness, which included personality disorders, or the evidentiary basis for the court's finding that he suffers from a personality disorder.

**3. Mental Illness— criminal defendant found insane—recommitment—dangerousness to others—age of crimes**

In a recommitment proceeding for a respondent who had been found not guilty of multiple murders and assaults by reason of insanity, the trial court did not err by finding respondent dangerous to others under N.C.G.S. § 122C-276.1 and N.C.G.S. § 122C-3(11)b. The probative value of evidence of respondent's "extremely violent homicidal" crimes far outweighed any potential prejudice due to the crimes' age; furthermore, it is clear that the court's findings were also rooted in additional evidence unrelated to respondent's prior crimes.

Respondent appeals from order entered 27 October 1998 by Judge William Z. Wood in Forsyth County Superior Court. Heard in the Court of Appeals 27 March 2000.

In 1988, Respondent-Appellant Hayes was indicted and tried on 4 counts of first degree murder, 5 counts of felonious assault with a deadly weapon and 2 counts of assault on a law officer. Hayes was found not guilty of all charges by reason of insanity in 1989 and was committed to the Dorothea Dix state mental health facility in Raleigh pursuant to G.S. § 122C-261, *et seq.* This case involves Hayes' appeal of a 1998 order, issued after an annual re-commitment hearing pursuant to G.S. § 122C-276.1, continuing Hayes' confinement at Dix for another year in order "to ensure the safety of others and . . . to alleviate or cure [Hayes'] mental illness."

At Hayes' hearing, Drs. Seymour Halleck and James Bellard, both forensic psychiatrists, and Mr. Edwin Mundt, a Dix psychologist, testified that Hayes was not "actively" mentally ill. In support of their diagnosis, Hayes' three experts testified that (1) Hayes exhibited no symptoms of "current, active" psychoses for ten years, or personality disorders for two years, prior to the 1998 re-hearing; (2) Hayes' prior drug and alcohol dependence (which his expert witnesses say was the sole cause of Hayes' psychosis in 1988) had been successfully treated in the uncontrolled setting at Dix, where they testified alcohol and drugs were still obtainable; (3) Hayes was "statistically unlikely"

IN RE HAYES

[139 N.C. App. 114 (2000)]

to relapse into post-release drug and alcohol abuse; (4) Hayes was committed to post-release psychotherapy and attendance at Narcotics Anonymous and Alcoholics Anonymous meetings; and (5) Hayes' progress at Dix was attributable to his natural maturation though aging. In addition, several non-physician staff members at Dix testified as to Hayes' recent good behavior on his ward, normal interaction with other Dix patients, stable work history, and progress in various treatment programs.

Drs. Halleck, Bellard and Mundt discounted evidence of recent hostile behavior by Hayes—the 1997 "the slaw incident"—in which Hayes "got upset and became angry" with his job supervisor over his co-worker's premature disposal of coleslaw from the hospital grill where Hayes is employed. This incident resulted in the revocation of staff's recommendation that Hayes be given increased privileges, including "off-campus" job privileges. Hayes' three experts attributed Hayes' aggressive behavior to his perfectionism and the stress of "being a sane man in a mental hospital," and considered the incident to be an isolated event which was not symptomatic of continuing mental illness.

On cross examination, Drs. Halleck and Bellard stated that Hayes had a psychotic disorder in July of 1988 and for at least three months thereafter. In July 1988, Hayes killed four people and wounded several others. Drs. Bellard and Halleck also testified on cross-examination that through 1996, Hayes suffered from a personality disorder which, prior to July 1988, manifested itself in Hayes' prolonged use of marijuana to "calm himself down" and several instances of cruelty to animals. Dr. Halleck conceded that Hayes' success in controlling his drug and alcohol problems at Dix occurred in an environment where there were at least "some controls" and agreed that North Carolina has no formal means of supervising insanity parolees after their release. Dr. Bellard testified that without post-release treatment to help Hayes adjust to the outside world, Hayes "has a risk of returning to drug abuse because he has a history of it." Mr. Mundt confirmed that early 1990's testing showed that Hayes posed a serious risk of returning to the "biker lifestyle" if released.

Drs. Halleck, Bellard and Mundt testified that while Hayes' violent acts in 1988 were "relevant" to determining his potential for post-release dangerousness, his recent progress was a better predictor of the danger Hayes might pose. While he was unaware of a 1992 report that Hayes had expressed a need to arm himself upon his release for

IN RE HAYES

[139 N.C. App. 114 (2000)]

his own protection, Dr. Bellard believed that Hayes no longer felt that way. Based on Hayes' recent progress, Hayes' experts concluded that he was no longer dangerous.

Dr. Margery Sved, the director of adult psychiatry at Dix since 1989, Dr. Jonathan Weiner, a forensic psychiatry expert appointed to assist the trial court in the Hayes' case, and Dr. Jarrett Barnnhill, Hayes' attending psychiatrist, all testified that Hayes' was still mentally ill and dangerous to others.

When called *by Hayes*, Dr. Barnhill testified that in Dix's "structured setting," Hayes was "highly functional" and currently free of symptoms of psychosis. However, Dr. Barnhill stated that Hayes (1) posed a risk of relapse into drug addiction, which Dr. Barnhill believed to be the sole cause of Hayes' 1988 psychosis, and (2) continued to display some elements of a personality disorder, including perfectionism, a low tolerance for frustration and inadequate impulse control, which left Hayes "vulnerable" to stressors present in the outside world.

Drs. Weiner and Sved, called by the State, diagnosed Hayes with a "long-standing," albeit "markedly diminished," personality disorder with antisocial and narcissistic traits. Dr. Barnhill concurred in this diagnosis. Drs. Weiner and Sved reported a sixty percent likelihood that Hayes would relapse into substance abuse/addiction in an uncontrolled setting. Drs. Weiner and Sved also testified to the existence of additional elements of personality disorder in Hayes, including his "suspicio[ns] of others' motives," "limited" ability to empathize with other people, "perceptions that others will act against him of [sic] in some way out to get him," and a "defensive, irritable and sarcastic" attitude when receiving "therapeutic feedback." Drs. Sved and Weiner also emphasized the continued existence of "stressors" which they believed had in part triggered Hayes' initial psychosis and increased the likelihood of its recurrence. The primary stressor was Hayes' limited physical, emotional and financial ability to care for three children (two of whom were born during Hayes' confinement) and his girlfriend, who also has "psychological difficulties."

Drs. Barnhill, Sved and Weiner stated that Hayes' history of violence was the best indicator of whether Hayes posed a danger to others, and that there was a reasonable probability that Hayes would be a danger to others if released. Dr. Barnhill stated that in light of Hayes' violent history and high risk of relapse into substance abuse in an uncontrolled setting, he "would probably *never* feel comfortable

IN RE HAYES

[139 N.C. App. 114 (2000)]

saying that [Hayes] is over his addiction[s], over his risk of future aggression, no matter how well he's doing now."

After Hayes' two-day hearing, the trial court re-committed Hayes to Dix for another year based on the following findings:

No. 3. [A]t the time of the killings and of the felonious assaults . . . on July 17 1988, Mr. Hayes suffered from an acute psychotic episode which lasted approximately 4 months in duration from the week before the killings on July 17, 1988, up to and including the time period in which he was being treated and observed at Dorothea Dix Hospital in October 1988; that this psychotic episode evidences a schizophreniform disorder and that this is an Axis I (DSM-IV) mental illness; that although the psychotic phase of this illness has apparently not recurred since his admission . . . in 1989, it is unclear whether this particular mental illness will recur . . . should the respondent be released from his current controlled environment at Dorothea Dix Hospital; that Michael Hayes is currently given a diagnosis of and meets criteria in the Diagnostic and Statistical manual, edition four, of the American Psychiatric Association (DSM-IV) of: Axis I, History of Schizophreniform Disorder; or History of Psychotic Disorder NOS [not otherwise specified, DSM Code 298.90]; Axis I, Cannabis Abuse (abstinent) in a controlled environment; Axis I, Alcohol Dependence (abstinent) in a controlled environment; as described in testimony of expert witnesses at this hearing;

No. 4. That Michael Hayes also presently suffers from . . . an Axis II (DSM-IV) mental illness designated as a Personality Disorder NOS (not otherwise specified) with anti-social and narcissistic traits; and that this Axis II mental illness is currently being treated, has not been cured, and that it is likely to continue in the future;

No. 5. That these . . . mental conditions either existed or are related to the mental conditions that existed at the time of the commitment of the homicides by Michael Hayes in 1988, and were probably causative factors in those homicides, and . . . constitute mental illnesses as defined by G.S. 122C-3(21).

No. 6. That the best predictor of future behavior is past behavior, especially when such behavior was in the relevant past; that the extremely violent homicidal behavior exhibited on July 17th, 1988, by Michael Hayes was conduct within the relevant past

which provides the Court with very important information in assessing Mr. Hayes' probable likelihood for future violent behavior and for present and future dangerousness to others.

No. 7. [T]hat the four homicides and seven felonious assaults committed by Michael Hayes on July 17th, 1988, are episodes of dangerousness to others in the relevant past which in combination with his past and present mental condition, his multiple mental illnesses, and his conduct since July 17, 1988, lead the Court to find there is a reasonable probability that Michael Hayes' seriously violent conduct will be repeated and that he will be dangerous to others in the future . . . . There is a reasonable probability that if Michael Hayes were released today that it is likely that he may relapse into his previous pattern of multi-substance abuse and dependance, and relapse into a situation repeating his exposure to the same ordinary life stressors which were present in 1988 at the time of the killings, and that it is likely that should these kinds of relapses occur that Michael Hayes will run the risk of future violent behavior;

No. 8. The Court specifically finds that Michael Hayes is presently dangerous to others as defined by G.S. 122C-3(11)b . . . .

Hayes appeals.

*Attorney General Michael F. Easley, by Assistant Attorney General John G. Barnwell, for the State.*

*Karl E. Knudsen for respondent-appellant.*

EAGLES, Chief Judge.

To be released, Hayes must have shown by a preponderance of the evidence either that he is no longer mentally ill, G.S. § 122C-3(21), or that he is no longer dangerous to others, G.S. § 122C-3(11)b. *See* G.S. § 122C-276.1. We note that we denied Hayes' 1992 request to be released in *In re Hayes*, 111 N.C. App. 384, 432 S.E.2d 862, *appeal dismissed*, 335 N.C. 173, 436 S.E.2d 376 (1993), hereinafter "*Hayes I.*"

[1] In his brief, Hayes argues that the statutory definition of "mentally ill" applied here is unconstitutionally vague. *See* G.S. § 122C-3(21). The record reveals that Hayes did not argue this issue below, and therefore failed to preserve it for argument on appeal. N.C. R. App. P. 10(b)(1); *Peace River Elec. Co-op, Inc. v. Ward Transformer Co., Inc.*, 116 N.C. App. 493, 506-507, 449 S.E.2d 202, 212

(1994), *disc. rev. denied*, 339 N.C. 739, 454 S.E.2d 655 (1995) ("we will not decide at the appellate level a constitutional issue or question which was not raised or considered in the trial court"). Assuming, *arguendo*, that the issue is properly before us, we would overrule this assignment of error under our prior holding that a nearly identical definition of mental illness under the prior statute was not unconstitutionally vague. *In re Salem*, 31 N.C. App. 57, 60-61, 228 S.E.2d 649, 651-52 (1976) (analyzing former G.S. §§ 122-36(d) and 58.1).

**[2]** Hayes also argues that he can no longer be classified as "mentally ill" under *Foucha v. Louisiana*, 504 U.S. 71, 118 L.Ed.2d 437 (1992), and that the trial court violated his due process rights by (1) concluding as a matter of law that he failed to meet his burden of proof and (2) again ordering his return to confinement at Dix. We disagree.

In *Foucha*, the United States Supreme Court invalidated a Louisiana statute under the due process clause because it permitted the re-commitment of an insanity acquittee, Foucha, to a mental institution on evidence that Foucha was "dangerous to others" and had an "antisocial" personality, but was not insane. Here, Hayes argues that *Foucha* "established . . . [that] a personality disorder alone does not qualify as a mental illness which justifies involuntary confinement." Hayes further argues that because (1) he has recovered, like Foucha, from the schizophreniform mental illness or drug-induced psychosis which led him to commit his crimes and (2) he has abstained from drugs and alcohol for at least six years, he is no longer mentally ill and must be released pursuant to *Foucha*. We disagree.

*Foucha* is distinguishable because there, the State of Louisiana *conceded* that Foucha's "antisocial" personality did not constitute mental illness under Louisiana state law. *Id.* at 80, 118 L.Ed.2d at 447. The *Foucha* Court therefore never reached the issue of whether "antisocial" behavior or other types of personality disorders are mental illnesses. As noted by the Virginia Supreme Court in a case similar to the one at bar,

> [t]he government in *Foucha* did not argue that Foucha's [Anti Social Personality Disorder, or] APD was a mental illness; rather, it relied on the trial court's finding that the APD made Foucha a danger "to himself or others." *Id.* at 78, 112 S.Ct. 1780. *Thus, the Supreme Court did not decide in Foucha whether APD is a mental illness*, but simply affirmed the principle that a state cannot confine an individual with a mental illness absent a showing by

clear and convincing evidence "that the individual is mentally ill and dangerous." *Id.* at 80, 112 S.Ct. 1780 (quoting *Jones v. United States*, 463 U.S. 354, 362, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983)).

*Mercer v. Commonwealth*, 523 S.E.2d 213, 215 (Va. 2000) (emphasis added). We agree with *Mercer* that *Foucha* did not define "mental illness."

Thus, assuming *arguendo* that Hayes is neither psychotic nor drug or alcohol dependent, he may still be found "mentally ill" by virtue of having been diagnosed with a personality disorder. Hayes does not otherwise challenge either (1) G.S. § 122C-3(21)'s definition of mental illness, which includes personality disorders, or (2) the evidentiary basis for the court's finding that Hayes suffers from a personality disorder with antisocial and narcissistic traits. Accordingly, we defer to the trial court's finding, supported by competent expert testimony, that Hayes is mentally ill. *See In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980) (Court of Appeals' only function on appeal from commitment order is to determine if the trial court's ultimate findings on the issues of acquittee's mental illness and dangerousness were supported by competent evidence set out in the order).

[3] Finally, we decide whether the trial court erred in finding Hayes "dangerous to others" under G.S. § 122C-276.1 and 122C-3(11)b. In *Hayes I*, we held in part that it did not violate due process to require Hayes to bear the burden of proof under G.S. 122C-276.1 that he is no longer "dangerous to others." *Hayes* at 389-91, 432 S.E.2d at 866-67. G.S. § 122C-3(11)b provides that:

"Dangerous to others" means that *within the relevant past*, the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another or has acted in such a way as to create substantial risk of serious bodily harm to another, or has engaged in extreme destruction of property; and that there is a reasonable probability that this conduct will be repeated. Previous episodes of dangerousness to others, when applicable, may be considered when determining reasonable probability of future dangerous conduct. Clear, cogent and convincing evidence that an individual has committed a homicide *in the relevant past* is prima facie evidence of dangerousness to others. (emphasis added).

In *Davis v. N.C. Dept. of Human Resources*, 121 N.C. App. 105, 465 S.E.2d 2 (1995), *disc. rev. denied*, 343 N.C. 750, 473 S.E.2d 612 (1996), we held that although the issue is to be decided by trial courts on a case-by-case basis, prior "violent acts" may be found to have occurred in the "relevant past" when they "occurred close enough in time to the . . . hearing to have probative value on the ultimate question . . . of whether there was a 'reasonable probability that such [violent] conduct [would] be repeated.' " *Id.* at 114-15, 465 S.E.2d at 8 (citing G.S. § 1A-1, Rule 401).

Hayes asserts that *Davis'* definition of "relevant past" is "ambiguous" and that the current statutory scheme denies him due process of law. Specifically, he contends that a court could arbitrarily and capriciously continue his confinement by "operation of law" by finding his crimes to be in the ambiguously-defined "relevant past," despite "proof" that Hayes had not exhibited dangerous behavior since 1988 and was no longer "mentally ill." Instead, Hayes argues by analogy to N.C. R. Ev. 404(b) and 609 that the trial court should have considered his ten-year-old crimes' temporal "remoteness" from the hearing in deciding their admissibility for purposes of determining "dangerousness." We are not persuaded.

As noted above, Hayes failed to meet his burden of proof that he is no longer mentally ill. Furthermore, uncontested evidence of the "slaw incident" demonstrated that Hayes has engaged in dangerous conduct since 1988. The real issue is therefore whether the court denied Hayes due process in applying the relevant statutes.

By *Davis'* references to timing, it is clear that in determining whether acquittees' prior crimes fall into the "relevant past," trial courts *may* consider the crimes' temporal proximity to the hearing date in evaluating their prejudicial effect. This analysis is similar to that required by Rules 403, 404(b) and 609. Undercutting Hayes' argument, however, is the rule that prior crimes' temporal remoteness has more to do with the crimes' evidentiary weight than their admissibility. *See, e.g., State v. Blackwell*, 133 N.C. App. 31, 514 S.E.2d 116, 120, *cert. denied*, 350 N.C. 595, 537 S.E.2d 483 (1999) (citing *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991)) ("remoteness in time generally affects only the weight to be given [Rule 404(b)] evidence, not its admissibility"). In addition, *Davis'* reference to Rule 401 emphasizes that trial courts enjoy great discretion in deciding the probative value of acquittee's prior crimes. *See* G.S. § 122C-3(11)b ("[p]revious episodes of dangerousness to others, *when applicable, may be considered* when determining reasonable probability of

future dangerous conduct"). We conclude that in the context of this case, (1) courts are not constrained by the timing considerations in Rules 404 and 609, as Hayes contends, and (2) lapse of time is only one factor in the court's analysis under Rules 401 and 403.

In this case, it appears that from both evidentiary and medical perspectives, the nature of Hayes' crimes was more important than their timing. In other words, on the issue of the likelihood of Hayes' future dangerousness to others, the probative value of evidence of Hayes' "extremely violent homicidal" crimes far outweighed any potential prejudice due to the crimes' age. Furthermore, it is clear from the order that the court's findings on Hayes' dangerousness were also rooted in *additional* evidence unrelated to Hayes' prior crimes, including (1) Hayes' past and present mental illness, (2) Hayes' behavior since 17 July 1988 (including the "slaw incident"), and (3) Hayes high likelihood of post-release relapse into multi-substance abuse, which all experts agreed was a trigger for his 1988 psychosis. Accordingly, we hold that the trial court did not violate Hayes' right to due process.

Affirmed.

Judges TIMMONS-GOODSON and HUNTER concur.