IN THE MATTER OF: MICHAEL CHARLES HAYES, Respondent

No. COA01-717

(Filed 18 June 2002)

**1. Appeal and Error— insanity recommitment—reviewed as commitment order**

A recommitment order for a respondent who had been found not guilty of murder and assault by reason of insanity was reviewed on appeal as a commitment order; thus, there is a determination of whether there is competent evidence to support the trial court's findings and whether the findings support the conclusion that respondent still has a mental illness and is dangerous to others.

IN RE HAYES

[151 N.C. App. 27 (2002)]

**2. Mental Illness— 1989 insanity acquittal—current mental illness and danger to others—findings**

Findings that a defendant who was found not guilty of murder and assault by reason of insanity in 1989 currently suffers from mental illness and presents a danger to others were supported by competent evidence.

**3. Mental Illness— insanity acquittal—recommitment—dangerous to others**

The statutory definition of "dangerous to others" does not make it impossible for a person who has been acquitted of homicide by reason of insanity to prove that he is no longer dangerous to others in a recommitment hearing. Such a person will be presumed dangerous to others and has the burden of rebutting that presumption, but the court may find that he is no longer dangerous to others if that burden is carried.

Appeal by respondent from judgment entered 10 January 2001 by Judge Steve Balog in Forsyth County Superior Court. Heard in the Court of Appeals 14 March 2002.

*Attorney General Roy Cooper, by Assistant Attorney General Diane Martin Pomper, for the State.*

*Karl E. Knudsen, for respondent-appellant.*

HUDSON, Judge.

Michael Charles Hayes ("respondent") appeals from an order of recommitment. For the reasons given below, we affirm.

In 1988, respondent was indicted on four counts of first degree murder, five counts of felonious assault with a deadly weapon, and two counts of assault on a law officer. In 1989, a jury found him not guilty on all counts by reason of insanity, and respondent was committed to a state mental health facility.

Since the time of his original commitment, respondent has been recommitted at each hearing on the matter. Respondent has appealed several of the recommitment orders, resulting in two published opinions from this Court. *See In re Hayes*, 139 N.C. App. 114, 532 S.E.2d 553 (2000); *In re Hayes*, 111 N.C. App. 384, 432 S.E.2d 862, *appeal dismissed*, 335 N.C. 173, 436 S.E.2d 376 (1993). The most recent hearing occurred on 8 January through 10 January 2001. The relevant tes-

timony is reviewed below. Following the hearing, the superior court ordered that respondent's commitment be extended by an additional 365 days. Respondent appeals.

By statute, when a defendant has been involuntarily committed to a mental institution pursuant to N.C. Gen. Stat. § 15A-1321(b) following an acquittal by reason of insanity, the court is required to hold a hearing fifteen days before the end of any commitment period. *See* N.C. Gen. Stat. § 122C-276.1(a) (1999). At this hearing,

> [t]he respondent shall bear the burden to prove by a preponderance of the evidence that he (i) no longer has a mental illness as defined in G.S. 122C-3(21), or (ii) is no longer dangerous to others as defined in G.S. 122C-3(11)b. If the court is so satisfied, then the court shall order the respondent discharged and released. If the court finds that the respondent has not met his burden of proof, then the court shall order inpatient commitment be continued . . . . The court shall make a written record of the facts that support its findings.

N.C. Gen. Stat. § 122C-276.1(c) (1999). "Mental illness" is defined as "an illness which so lessens the capacity of the individual to use self-control, judgment, and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under treatment, care, supervision, guidance, or control." N.C. Gen. Stat. § 122C-3(21)(i) (1999). "Dangerous to others"

> means that within the relevant past, the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a substantial risk of serious bodily harm to another, or has engaged in extreme destruction of property; and that there is a reasonable probability that this conduct will be repeated. Previous episodes of dangerousness to others, when applicable, may be considered when determining reasonable probability of future dangerous conduct. Clear, cogent, and convincing evidence that an individual has committed a homicide in the relevant past is prima facie evidence of dangerousness to others.

N.C. Gen. Stat. § 122C-3(11)(b) (1999).

[1] We see no reason to distinguish the standard of review of a recommitment order from that of a commitment order, and hence, we review this order as we would a commitment order. Thus, we must determine whether there is competent evidence to support the trial

court's factual findings and whether these findings support the court's ultimate conclusion that respondent still has a mental illness and is dangerous to others. *Cf. In re Lowery*, 110 N.C. App. 67, 71, 428 S.E.2d 861, 863 (1993) (standard of review for commitment order pursuant to N.C.G.S. § 122C-268).

Respondent argues that the following facts found by the trial court are not supported by "the greater weight of the evidence."

3. At the time of the killings and felonious assaults committed by the respondent on July 17, 1988, the respondent suffered from an acute psychotic episode which lasted approximately 3 to 4 months in duration from the week before the killings on July 17, 1988, up to and including the time period in which he was being treated and observed at Dorothea Dix Hospital in October 1988. This psychotic episode evidences either a schizophreniform disorder, or a psychotic disorder, NOS (not otherwise specified). These illnesses are recognized as Axis I mental disorders by DSM-IV (Diagnostic and Statistical Manual of the American Psychiatric Association). Although the psychotic phase of this illness has apparently not recurred since his admission to Dorothea Dix Hospital in 1989, it is unclear whether this particular mental disorder will recur in the future should the respondent be released from his current controlled environment at Dorothea Dix Hospital. The respondent is currently given a diagnosis of and meets criteria in the DSM-IV of:

   a. Axis I, History of schizophreniform disorder; or history of psychotic disorder, NOS (not otherwise specified), and Rule out History of Substance-induced Psychotic Disorder with delusions and hallucinations, with onset during withdrawal;

   b. Axis I, Alcohol Dependence, in remission, in a controlled environment; Axis I, Cannabis dependence, in remission, in a controlled environment; and,

   c. Axis II, Personality Disorder NOS, with antisocial and narcissistic traits;

4. The diagnoses set out in items b. and c. above are mental illnesses which are currently being treated, have not been cured, and are likely to continue in the future;

5. The Axis I and Axis II mental disorders described in items b. and c. above, either existed or are related to the mental conditions that existed at the time of the commitment of the homicides by the respondent in 1988, and were probably causative factors in or related to the psychotic disorder evident during those homicides, described in item a. above; and, taken together and separately these mental disorders so lessen the capacity of Michael Hayes to use self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable for him to be under treatment, care supervision, guidance, or control, and, thus, they constitute mental illnesses as defined by G.S. 122C-3(21).

. . . .

7. The four homicides and seven felonious assaults committed by the respondent on July 17, 1988, are episodes of dangerousness to others in the relevant past which in combination with his past and present mental condition, his multiple mental illnesses, and his conduct since admission to Dorothea Dix Hospital since 1989, and up to and including his conduct in the hospital during the previous year indicates there is a reasonable probability that the respondent's seriously violent conduct will be repeated and that he will be dangerous to others in the future if unconditionally released with no supervision at this time. That there is a reasonable probability that if the respondent were released today it is likely that he may relapse into his previous pattern of multi-substance abuse/dependence, and relapse into a situation repeating his exposure to the same ordinary life stressors at least as serious as those which were present in 1988 at the time of the killings. It is likely that, should these kinds of relapses occur, the respondent will run the risk of future violent behavior;

8. The respondent is dangerous to others as defined by G.S. 122C-3(11)b; he suffers from multiple mental illnesses as previously described by the Court; and that continued hospitalization is advisable to ensure the safety of others and to alleviate, treat, or cure his mental illnesses.

Contrary to the standard articulated by respondent—that we should review "the greater weight of the evidence"—we are bound to uphold these findings if there is any competent evidence to support them. It is for the trial court, not this Court, to determine the weight that

should be given to evidence and, ultimately, "whether the competent evidence offered in a particular case met the burden of proof." *In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980); *see In re Underwood*, 38 N.C. App. 344, 347-48, 247 S.E.2d 778, 780-81 (1978).

[2] Respondent particularly objects to the findings quoted above insofar as the court determined that respondent currently suffers from mental illness and presents a danger to others. Having carefully reviewed the record, we hold that these findings are supported by competent evidence.

With regard to the question of mental illness, Dr. Jonathan Weiner, who was qualified as an expert in the field of forensic psychiatry and was appointed as an expert to assist the court in determining whether respondent met the criteria for release, diagnosed respondent as follows:

> I gave [respondent] a primary psychiatric diagnosis on Axis I of alcohol dependence, sustained full remission in a controlled environment, and cannabis dependence, which is marijuana, sustained full remission in a controlled environment. I gave him the additional diagnosis of Axis II, history of a personality disorder not otherwise specified with antisocial and narcissistic traits, and on Axis I, history of a schizophrenic form disorder and also on Axis I, rule out a history of substance-induced psychotic disorder with delusions and hallucinations with onset during withdrawal.

Dr. Jim Bellard, who was qualified as an expert in forensic psychiatry, testified that he gave respondent a diagnosis under Axis I of history of psychotic disorder, not otherwise specified. Dr. Robert S. Brown, Jr., who was qualified as an expert in the field of forensic psychiatry and was appointed to assist the State as an expert in reviewing the case, testified that he gave respondent a diagnosis of personality disorder NOS, Not Otherwise Specified, with "aspects of antisocial traits and aspects of narcissistic traits that relate directly to the personality disorder NOS." Dr. Brown testified that "without a doubt [respondent] has ongoing—he has an ongoing mental illness diagnosis of a personality disorder." This evidence supports the trial court's Finding of Fact No. 3, regarding respondent's diagnoses.

Dr. Weiner testified that "alcohol dependence, sustained full remission is a mental illness. It meets the statutory require-

ments . . . ." Both Dr. Weiner and Dr. Brown testified to the opinion that respondent is not cured or recovered from alcohol dependence or cannabis dependence. Dr. Brown testified that "without a doubt [respondent] has ongoing—he has an ongoing mental illness diagnosis of a personality disorder." Dr. Mark Hazelrigg, who is the program director for the forensic treatment program at Dorothea Dix Hospital and was qualified as an expert in the field of forensic psychology, acknowledged that "it's unusual for a person to be cured of a personality disorder completely." Dr. Brown explained the difference between his opinion and that expressed by those who testified that respondent is no longer mentally ill as follows:

> I think that some of my colleagues may have forgotten something; and that is, it's axiomatic, that if a patient has a personality disorder, that ten years from now, whether they're terribly misbehaving or not, as an axiom, they still have a personality disorder. It's just less evident. They're just expressing it less for whatever reason. Maybe the stress is minimized, maybe they're in a controlled environment, maybe the—the external goal of getting out of the mental hospital is so strong, they're careful what they say to whom.

Dr. Hazelrigg acknowledged under cross-examination that, in the year prior to the hearing, respondent had been involved in several incidents that evinced behavior consistent with a personality disorder. Edwin Munt, a psychologist who provided individual therapy to respondent, agreed on cross-examination that these "behaviors could be personality characteristics that are reflective of some problems that he had in the past with—in terms of personality disorders."

For example, respondent's medical records indicated that he had been involved in "several instances of power struggles with Dorothea Dix Hospital police." Additionally, respondent became angry when the door to the Alcoholics Anonymous ("AA") meeting room was not opened; Dr. Hazelrigg acknowledged that respondent "indicate[d] anger, hostility" during the incident. On another occasion, respondent hit a vending machine with his shoulder, shattering the glass, after his snack got caught in the machine. On 30 September 2000, there was an entry from a nurse reading: "Although [respondent] continues to be somewhat manipulative and/or exploitive of staff, he has this month been generally pleasant and nonproblematic." An entry on 12 October indicated that staff had reported that respondent had been "arrogant," which is consistent with a narcissistic trait.

Respondent had conflicts with his girlfriend and with other patients.[Tr.I, 120-24] His medical records indicated an "ongoing conflict with another patient," which, according to Dr. Hazelrigg, involved a disagreement over how to run the AA and Narcotics Anonymous meetings. This conflict lasted "for a couple of weeks." One patient who worked with respondent wanted to quit his job because respondent repeatedly kicked him. An inmate from the women's prison who worked with respondent complained that respondent used inappropriate language with her. Dr. Brown, who later interviewed her, testified that "she reported essentially a three-week period of time where [respondent] remained angry with her, hostile toward her, and was verbally abusive to her."

Dr. Brown testified that he asked respondent about the incidents between respondent and his co-workers, and respondent "basically said that he didn't do any of those things." Respondent acted "shocked" when Dr. Brown discussed the accusations of respondent's co-workers with him, and Dr. Brown testified that respondent "thought that perhaps there was something going on regarding a conspiracy to damage his attempts at—to being released."

Dr. Hazelrigg testified to respondent's current treatment program as follows:

> [T]he treatment has been focused on issues of substance abuse and recover [sic] from addiction. To that extent, most of the treatment modalities are substance abuse related. He attends AA groups, both in the hospital and in the community, with staff supervision. He participates in daily work assignments and he has individual sessions with a psychotherapist, and at one point he had family therapy sessions with another therapist.

When asked about the prominent traits of respondent's personality disorder, Dr. Hazelrigg answered:

> In the past, the specific types of personality disorder features that he showed were antisocial features, which would be manipulating other people, aggression, and the other set of features were narcissistic features which involved having a self-centered view of things, feeling he's entitled to special treatment and special privileges and favors.

Dr. Hazelrigg testified that respondent's psychotherapy sessions involved issues of anger control, and agreed that anger control is "an issue that has arisen from [respondent's] personality disorder diag-

noses." Dr. Hazelrigg acknowledged that "follow[ing] [a] structured schedule and abid[ing] by rules without being manipulative or exploitative" was a short-term goal identified in an entry on respondent's hospital chart dated 3 October 2000. Dr. Brown testified to his opinion that the treatment respondent is receiving at Dorothea Dix "is appropriate for the mental health problems" from which Dr. Brown believes respondent suffers.

This evidence supports Finding of Fact No. 4, that the diagnoses in parts b. and c. of Finding of Fact No. 3 are "mental illnesses which are currently being treated, have not been cured, and are likely to continue in the future."

Dr. Brown testified that, in his opinion, respondent has suffered since adolescence from, and continues to suffer from, a personality disorder, which means he "had a history, an enduring pattern of inner experience . . . and behaviors that deviate markedly from the expectations of [his] culture." This enduring pattern "leads to clinically significant distress or impairment socially, occupationally, or other areas, important areas of function." And respondent's substance abuse problems "were, in part, the result of the personality disorder." Dr. Weiner testified to his opinion that "the alcohol dependence and the cannabis dependence were related to events that perhaps led to [respondent's] psychotic break." He agreed that respondent's abuse of alcohol and his abuse of cannabis were "probably causative factors in the events that led to [the] homicides." This evidence supports the trial court's factual finding that respondent's mental disorders "either existed or are related to the mental conditions that existed at the time of the commitment of the homicides . . . in 1988, and were probably causative factors in or related to the psychotic disorder evident during those homicides."

Dr. Brown testified that it was his opinion, based on his diagnoses, that respondent continues to be mentally ill as defined in N.C.G.S. § 122C-3(21). This, together with the evidence reviewed above, constitutes evidence in support of the trial court's finding to that effect in Finding of Fact No. 5.

There is competent evidence in the record to support the findings of fact relating to mental illness made by the trial court. Accordingly, the court did not err in its findings numbered three through five.

With regard to whether respondent is dangerous to others, Dr. Weiner agreed that respondent's "violent history . . . is behavior that

IN RE HAYES

[151 N.C. App. 27 (2002)]

has occurred in the relevant past that is appropriate for the Court to consider in assessing future dangerousness." Dr. Brown also opined that the homicides and other violent felonies committed by respondent are relevant in assessing future dangerousness; he responded to questioning in this regard as follows:

Q. Do you consider the four—evidence of four homicides and five or more felony assaults which occurred in July of 1988 to be relevant in your clinical determination of the probability of [respondent's] future violent behavior?

A. Yes, I believe they're relevant. They're relevant because history of violence in the past is the best predictor of violence in the future.

Of relevance to respondent's mental condition is Dr. Brown's testimony regarding psychological testing performed by Dr. John F. Warren. In particular, Dr. Warren had administered the Minnesota Multiphasic Personality Inventory II test (the "MMPI-II") to respondent on 18 September 2000. Dr. Brown quoted from Dr. Warren's results as follows:

"He is characterized as angry, belligerent, rebellious, resentful of rules and regulations, and hostile toward authority figures. He is likely to be impulsive, unreliable, egocentric, and irresponsible. He often has little regard for social standards. He often shows poor judgment and seems to have difficulty planning ahead and benefiting [sic] from his previous experiences. He makes a good first impression, but long-term relationships tend to be rather superficial and unsatisfied.

. . . .

He may be described as exhibiting excessive control as hostile impulses, but also is exhibiting periodic, angry outbursts. He is socially alienated and is reluctant to admit any form of a psychological symptom. He is seen as rigid and not displaying anxiety overtly."

Dr. Brown testified that

the overall significance of the issue of overcontrolled hostility is that in life we—we come upon frustrating and irritating things; and if we don't address them because of the use of denial and repression and things like that, the amount of the inner tension can build up and it will erupt into a significant angry outburst.

Dr. Brown confirmed that such an "angry outburst" could be violent.

Dr. Weiner explained his diagnosis of alcohol and cannabis dependence, sustained full remission in a controlled environment, as it relates to the possibility that respondent could relapse into substance abuse, as follows:

> [W]hat happens in life is you get out into the world and you have all kinds of different stressors impact upon you. So, do you have the strengths and the coping skills to deal with that without relapsing again or lapsing into alcohol use? So, it has to do with motivation, it has to do with stressful events, it has to do with his cognitive behavioral changes that have gone on. So, it's a difficult clinical question. There's always a possibility that he would relapse. Is it probable? It's less probable now than it was two years ago, but it's possible. Of course, it's possible.

While, according to Dr. Weiner, respondent would have a small chance of relapsing into substance abuse if he stayed in AA, there is a ninety percent chance of relapse for those who drop out of treatment; this might occur as a result of "some unforeseen things that happen in people's [sic] lives, stressful things that happen in people's [sic] lives: Loss, deaths."

Dr. Hazelrigg testified that if respondent "started abusing drugs and he developed the personal [sic] disorders again, then there would be a high probability of violent behaviors." Mr. Munt confirmed that if respondent "were exposed to severe social, family, economic stressors upon release, that he may have some susceptibility to redevelop a psychosis," and that a person who has demonstrated extreme violence while psychotic is at a greater risk for violence if he becomes psychotic again.

Dr. Brown testified that, in his opinion, respondent is at an "unacceptably high risk" for relapse into substance abuse if he was released because of his "personality and his low frustration tolerance for certain forms of stress." Dr. Brown further testified that he viewed respondent "as an individual, because he's had one episode of drug-induced psychosis, as being vulnerable to having another episode of psychosis with substance abuse." Regarding the risk of future dangerousness, Dr. Brown testified as follows:

> Q. And have you considered various types of factors in assessing his risk for future violent behavior?

A. Yes. You know, forensic psychiatrists deal with not the prediction of risk, but the assessment of risk, the assessment of risk. And by and large we do this in two categories. As the category of—of dynamic factors, things which can be addressed through treatment, for instance, if someone is psychotic, one of the dynamic—that may be a dynamic factor relating to future violence and you can treat that with medication. But there are other factors having to do with static things, things that are primarily historical in nature and refer back to the past.

Now, some of those things carry with them a risk of future violence, and everything from some—some history of juvenile delinquency, a history of being suspended from school, a history of witnessing or being abused in your childhood. If your mother was abused and you saw it or if you were abused as a child. A history of substance abuse, a history of engaging in illegal occupations, a history of cruelty to animals, and all of those things which we really can't change today but are still important today with regard to the future prediction of others.

Q. And have you seen some of those risk factors present in [respondent's] history?

A. All of them.

Q. And do you consider those to be significant in predicting future probability of dangerousness or violence?

A. They're significant today—even today concerning the assessment of the risk of future violence.

Dr. Brown testified that, in his opinion, respondent continues to pose a risk of danger to others, as defined in N.C.G.S. § 122C-3(11).

The evidence reviewed above, together with the evidence supporting the trial court's findings regarding respondent's mental illness, supports the court's Findings of Fact No. 7 and No. 8. Accordingly, the court did not err in making these findings.

**[3]** Respondent argues that the statutory definition of "dangerous to others" makes it impossible for a respondent who has been acquitted of homicide by reason of insanity to prove that he is no longer dangerous to others when the trial court finds that the homicide was committed in the "relevant" past. The statute provides that "[c]lear,

IN RE HAYES

[151 N.C. App. 27 (2002)]

cogent, and convincing evidence that an individual has committed a homicide in the relevant past is prima facie evidence of dangerousness to others." N.C.G.S. § 122C-3(11)(b).

Respondent's argument is based on the assertion that "a person who has been acquitted of a homicide by reason of insanity and is involuntarily committed due to his or her mental illness, will always be considered dangerous to others as long as the court finds that the homicide occurred in the 'relevant past.' " A person who has been acquitted by reason of insanity of a homicide that the court has found to have occurred in the relevant past will not "always be considered" dangerous to others, as respondent asserts; rather, pursuant to the statute, such a person will be presumed dangerous to others. The respondent has the burden of rebutting that presumption. If the respondent successfully carries his burden, the trial court may find that he is no longer dangerous to others. While we agree that the General Assembly has set a high hurdle for the respondent to overcome in these circumstances, a difficult burden is justified. We find respondent's fear that the burden can never be met unwarranted and his argument to be without merit.

We have already rejected respondent's argument that he has been denied due process because the statute does not define "relevant past." *See Hayes*, 139 N.C. App. at 122, 532 S.E.2d at 559. Respondent contends that he has "proven by a preponderance of the evidence that he has not exhibited behavior which would be indicative of dangerousness since 1988," and that he has "fully recovered from the mental illness which rendered him dangerous in 1988." Thus, he argues, "the prior homicides cannot reasonably be considered as being within the 'relevant' past so as to justify a finding of present dangerousness." As we have noted above, however, there is competent evidence in the record to support the trial court's finding that respondent committed the homicides in the relevant past, a determination that the legislature placed in the sound discretion of the trial court. We also held that there is competent evidence to support the finding that respondent continues to be dangerous to others. Therefore, we can ascribe no error to the court's conclusion that respondent failed to meet his burden to rebut the presumption, imposed by statute, that he is dangerous to others. *See Collins*, 49 N.C. App. at 246, 271 S.E.2d at 74 (trial court determines "whether the competent evidence offered in a particular case met the burden of proof").

Respondent next argues that the trial court's legal conclusion that respondent failed to bear his burden of proving that he meets the cri-

teria for release is error. We disagree. We held above that the court's findings of fact are supported by competent evidence. We also hold that these findings support the conclusion that respondent continues to suffer from a mental illness and is dangerous to others.

*Foucha v. Louisiana*, 504 U.S. 71, 118 L. Ed. 2d 437 (1992), does not help respondent. At issue in *Foucha* was a Louisiana statute that allowed "the indefinite detention of insanity acquittees who are not mentally ill but who do not prove they would not be dangerous to others." *Id.* at 83, 118 L. Ed. 2d at 450. In *Foucha*, the Supreme Court noted its earlier holding that an "acquittee may be held as long as he is both mentally ill and dangerous, but no longer." *Id.* at 77, 118 L. Ed. 2d at 446. The State of Louisiana did not "contend that Foucha was mentally ill at the time of the trial court's hearing. Thus, the basis for holding Foucha in a psychiatric facility as an insanity acquittee [had] disappeared, and the State [was] no longer entitled to hold him on that basis." *Id.* at 78, 118 L. Ed. 2d at 447. Here, the trial court has found both that respondent is mentally ill and that he has failed to prove he is not dangerous to others. Thus, *Foucha* is distinguishable. *See Hayes*, 139 N.C. App. at 120-21, 532 S.E.2d at 558.

Because respondent has shown no error in the trial court's findings of fact and conclusions of law, we hold that the court properly extended his commitment for another year. *See* N.C. Gen. Stat. § 122C-276.1(d) (1999). Accordingly, we affirm the judgment of the trial court.

Affirmed.

Judges MARTIN and THOMAS concur.