836 F.2d 209
 Linda Glenn CURRIE, Administratrix CTA of the Estate of
Ralph Augustus Glenn, Jr., deceased, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee,
v.
INTERNATIONAL BUSINESS MACHINES CORP., Third Party Defendant,
American Psychological Association, Amicus Curiae.
 No. 86-2643.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 2, 1987.
Decided Dec. 28, 1987.
 
 G. Jona Poe, Jr. (Terry D. Fisher; Stubbs, Cole, Breedlove, Prentis & Poe, Durham, N.C., on brief), for plaintiff-appellant.
 Harry L. Hobgood, Asst. U.S. Atty. (Robert H. Edmunds, Jr., U.S. Atty., Greensboro, N.C., on brief), for defendant-appellee.
 Paul R. Friedman, Donald N. Bersoff, Ennis, Friedman & Bersoff, Washington, D.C., on brief, for amicus curiae The American Psychological Ass'n.
 Before WIDENER and WILKINS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 HAYNSWORTH, Senior Circuit Judge:
 
 
 1
 The difficult question for decision is whether the North Carolina Supreme Court would impose upon a psychotherapist an affirmative duty to seek the involuntary commitment of a patient the therapist believed to be dangerous to others when the therapist had given warnings to those believed to be within the zone of danger. In this suit under the Federal Tort Claims Act (because the therapists are federal employees), the district court held that the North Carolina Supreme Court would impose such a duty, but that the duty would not be violated by a simple want of due care; a competent therapist exercising his best professional judgment and otherwise acting in good faith, would be protected from tort liability. Since the therapists in this case were clearly competent, indeed, highly qualified, and acted in entire good faith, the district judge entered judgment for the United States. 644 F.Supp. 1074 (M.D.N.C.1986).
 
 
 2
 On appeal, we affirm, but upon the alternative ground that the North Carolina Supreme Court would not hold a competent therapist to a duty of affirmatively seeking control over his patient through involuntary commitment.
 
 I.
 
 3
 On the afternoon of August 30, 1982, the plaintiff's decedent Ralph A. Glenn, Jr., was gunned down and killed by Leonard Avery, a Vietnam veteran suffering from Post-Traumatic Stress Disorder. Avery had been absenting himself from his work at The International Business Machines medical facility at Research Triangle Park, North Carolina. The absences were excused without loss of pay on the basis of written excuses given by a physician working at the Veterans Administration mental health clinic in Durham, North Carolina. Avery stopped attending weekly group sessions, however, and was told by IBM that he should attend the group session scheduled for August 16. Inquiry by a physician at IBM was met by a threat of violence, and, after further discussions with physicians at the Veterans Administration, Avery was informed by telephone on August 19 or 20 that he was discharged. The psychiatrist at the Veterans Administration declined to issue any more excuses for Avery's absences because of his failure to attend therapeutic sessions.
 
 
 4
 Just as he had threatened to do, on the afternoon of August 30, 1982, Avery entered IBM's medical facility at Research Triangle Park. He was clad in army fatigues and carried a semi-automatic rifle and some homemade bombs. He opened fire on those IBM employees he encountered, killing Glenn and wounding others. He was later convicted of Glenn's murder.
 
 
 5
 In April 1981, Avery consulted psychiatrists at the mental hygiene clinic at the Veterans Administration hospital in Durham. He was treated on an outpatient basis and, in June, was described as suffering from Post-Traumatic Stress Disorder. Some anti-psychotic medication was prescribed, and he was assigned to group therapy sessions.
 
 
 6
 Late in 1981, Avery became acutely upset over a dispute with his former wife about child support. He sought an emergency meeting with Dr. Buck, his group leader at the VA hospital, and voluntarily admitted himself to the hospital. At that time, Dr. Buck noted that Avery presented a "significant homicidal risk." The next day, however, Avery was calmed down by telephone conversations with his lawyer and with his former wife. Upon his request, he was then released.
 
 
 7
 Avery attended a group therapy session on July 26, 1982. He received a written excuse for absence from his work through August 2. He did not attend the group session on August 2, however. Avery told physicians at IBM that his continued absences were medically excused, but on August 13 IBM physicians consulted Dr. Buck at the VA hospital. They were told by Dr. Buck that Avery's absences had been excused only through August 2. The IBM physicians requested Avery to attend a group session scheduled to be held on August 16, and were apparently willing to excuse earlier absences. Avery failed to attend the August 16 session, however, and when an IBM physician, Dr. Connor, inquired of Avery about his failure to attend, Avery responded with a threat to blow up IBM's medical facility and its employees there. IBM reported these threats to a psychiatrist at the VA hospital, and was told that Avery had the potential for such acts of violence and that the threats should be taken seriously.
 
 
 8
 Upon learning of Avery's threat to blow up IBM's facility, Dr. Buck, Avery's group leader at the VA hospital, telephoned Avery. He succeeded in getting Avery to agree to a voluntary commitment, but Avery never showed up for it.
 
 
 9
 It was only upon IBM's learning of Avery's failure to submit to a voluntary commitment that he was called on the telephone and told that he was discharged.
 
 
 10
 On August 20, Avery called Dr. Buck and sought to obtain another written medical excuse. Dr. Buck declined to give it because Avery had ceased to attend group therapy sessions and had not come to the hospital for a voluntary commitment. Dr. Buck's refusal was met by a general threat that Dr. Buck immediately reported to IBM.
 
 
 11
 There was another telephone conversation between Dr. Buck and Avery on August 26. During that conversation, Avery threatened the psychiatrists. He charged them with having done nothing to help him and threatened to "blow your asses away" if he could get them in the same place at the same time.
 
 
 12
 That threat was also reported to IBM.
 
 
 13
 The psychiatrists also kept law enforcement agencies fully informed. They notified the United States Attorney, the Veterans Administration district counsel and security, the FBI and Durham city and county police departments. Special police protection was requested for Dr. Buck.
 
 
 14
 Meanwhile, there were repeated discussions among the psychiatrists about Avery and a possible commitment. There were eight physicians in the group. Each was a member of the faculty of Duke University Medical School, and seven of the eight had Board certification in psychiatry. Each time Avery's case was discussed, the psychiatrists came to the conclusion that Avery could not be committed involuntarily. In his conversations, Avery was lucid and in touch with reality. His dangerousness, the psychiatrist thought, was the product of his anger at IBM for discharging him and at the psychiatrists for declining to give him further written medical excuses, and not the product of mental illness. They thought the problem was for law enforcement officials.
 
 
 15
 The psychiatrists also discussed their possible obligations under the principles of Tarasoff v. Regents of the University of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). They felt their duty to give warnings had been fully discharged by keeping IBM informed and by their notification to all relevant law enforcement agencies.
 
 
 16
 After an unsuccessful administrative claim, the plaintiff brought this wrongful death action under the FTCA, 28 U.S.C. Secs. 2671-2680 (1982), alleging negligence on the part of the psychiatrists at the VA hospital in not seeking to obtain an involuntary commitment of Avery.
 
 
 17
 As indicated above, the district court thought that the North Carolina Supreme Court would recognize some duty to seek involuntary commitment by a psychiatrist of his patient, but, after weighing competing policy considerations, concluded that a duty to commit would not be violated by simple negligence. The psychiatrists were eminently qualified, and the district judge thought their good faith was abundantly demonstrated by their failure to seek involuntary commitment despite the fact that the psychiatrists themselves were among those seriously threatened by Avery. The fact that they sought no more than extra police protection for Dr. Buck seemed a demonstration of the sincerity of that belief that they must depend upon warnings and extra protective measures and that involuntary commitment was not an available alternative.
 
 II.
 
 18
 On appeal, it is much debated whether the conclusion of the psychiatrists that Avery was not subject to involuntary commitment was a diagnostic judgment or an inexcusable failure to understand and appreciate North Carolina law. The plaintiff argues seriously that, though Avery was not out of touch with reality at the time and though his violence may have been the product of anger, the excessive expression of that anger in violence was attributable to Avery's mental problem. The plaintiff thus contends that Avery was subject to involuntary commitment and that the psychiatrists were negligent in not having sought to accomplish it. All that, we think, is quite beside the point, for the plaintiff has not established any duty on the part of the psychiatrists to seek and obtain for themselves the right and the power to control Avery's conduct or to have him confined under the control of others.
 
 
 19
 In the absence of a relationship creating a duty to provide special protection for third persons, such as a landowner to his licensees or a railroad to its passengers, see Restatement (Second) of Torts Secs. 314A, 315 (1964), one is not ordinarily subject to liability for the conduct of a third person unless one has a right to control the conduct of the third person. Typical of relationships creating rights to control is that of master and servant, and the master's liability is dependent upon the existence of the right of control; generally, the master is not responsible for the conduct of his employee outside of the employment relationship and not in furtherance of it. Id. Sec. 317. It is a basic element of tort law that one having a right of control of the conduct of another should exercise the right responsibly and may be subject to liability to third persons injured because of failure to properly control the other's conduct.
 
 
 20
 When a mentally ill person has been lawfully committed to an institution and the institution has the right and the power to continue to restrain him, a negligent failure to exercise the power, so that a person who is both mentally ill and dangerous is released to wreak violence upon innocent third persons, renders those responsible for the failure to exercise control properly subject to liability to the person suffering harm. Restatement (Second) of Torts Sec. 319 (1964); see Semler v. Psychiatric Institute, 538 F.2d 121, 125 (4th Cir.), cert. denied, 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 90 (1976); Abernathy v. United States, 773 F.2d 184, 189 (8th Cir.1985). The result fits comfortably in established tort doctrine, and is the rule in North Carolina. Pangburn v. Saad, 326 S.E.2d 365, 367 (N.C.Ct.App.1985).
 
 
 21
 Such cases and the principle they exemplify have little bearing upon a situation in which the one sought to be charged had no right of control, and the complaint is that the one sought to be charged should have taken affirmative action to acquire the right of control or to have such a right vested in another.[1]
 
 
 22
 Nor is resolution of the problem substantially advanced by attempting to draw analogies to the duty to warn threatened third persons such as that declared in Tarasoff v. Regents of the University of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). The duty to warn is an expression of humanitarianism and the spirit of the good Samaritan. It runs only to identifiable persons within a recognizable zone of danger, and little resembles a general responsibility for a third person's conduct. A duty to commit, if there is such a duty, runs to all persons suffering foreseeable harm, whether or not those persons are subject to identification in advance. A duty to warn potential, identifiable victims of violence is not dependent upon a power of control of the conduct of the violent actor, but a duty to seek voluntary commitment necessarily treats the one subject to the duty as having the essence of the power to control.
 
 
 23
 Moreover, the policy considerations are quite different in the two situations. Affirmative steps by a psychiatrist to procure the involuntary commitment of his patient necessarily will be disclosed to the patient with the great likelihood that the psychiatrist's potential for constructive influence over the patient will be destroyed, while a warning to threatened third persons may well remain unknown to the patient or appear to the patient as not necessarily attributable to the physician. Initiation of involuntary commitment proceedings threatens the patient's constitutionally protected liberty interest, while warnings to third persons to take precautions does not.
 
 
 24
 For these reasons, we are unimpressed with such wayward decisions as Lipari v. Sears, Roebuck & Co., 497 F.Supp. 185 (D.Neb.1980). The special relationship between psychiatrist and patient gives rise to duties running from the psychiatrist to the patient, but the question is what, if any, duties there are running from the psychiatrist to third persons who, foreseeably, are potential victims of the patient's violence.
 
 
 25
 Nor is resolution of the problem advanced by such cases as In re Farrow, 255 S.E.2d 777 (N.C.Ct.App.1979), in which it was held that North Carolina's statutory physician-patient privilege does not prevent the patient's personal physician from testifying in an involuntary commitment proceeding. Indeed, the physician may initiate the involuntary commitment proceeding as provided in the North Carolina statute, id. at 780, but that bears little upon resolution of the physician's tort liability to injured third persons if the physician fails or neglects to invoke the permissive authorization of the statute.
 
 
 26
 There is, however, one other significant provision of the North Carolina statutory law.
 
 
 27
 At the time of this occurrence, N.C.Gen.Stat. Sec. 122-24, (1981) granted a general immunity for state hospitals and their employees in dealing with mental patients. Even in release from custody situations, the state hospital and its staff were immune from actions premised upon ordinary negligence and were subject to liability only for intentional torts or grossly negligent conduct. See Pangburn v. Saad, 326 S.E.2d 365, 368 (N.C.Ct.App.1985).
 
 
 28
 At that time, the statute provided no immunity for private physicians or for federal hospitals and their staffs, but the statute was amended effective January 1, 1986, to extend the immunity to all hospitals and their employees so long as "accepted professional judgment, practice, and standards" are followed. N.C.Gen.Stat. Sec. 122C-210.1 (1986). Technically, the psychiatrists at the VA hospital enjoyed no qualified statutory immunity at the time of Glenn's death, but the 1986 statutory extension strongly suggests that the limited immunity provided by the 1981 statute did not arise out of any legislative perception that state hospitals and their staffs should be given greater protection from tort claims than private physicians or federal institutions and federal employees. The natural inference is that, in 1981, the legislature perceived that only state hospitals and their staffs were at risk. If the only purpose of the 1981 statute was to protect and conserve state funds and the security of state employees, it is most unlikely that the identical immunity would have been extended to all mental health care institutions and physicians as was done in the statute effective January 1, 1986.
 
 
 29
 This solemn legislative declaration of North Carolina's public policy appears at odds with the plaintiff's position that damages should be awarded despite the fact that the psychiatrists acted in complete good faith and in the exercise of their best collective judgment.
 
 
 30
 This statutory immunity makes it most unlikely that the North Carolina Supreme Court would hold that North Carolina's public policy and its tort law would impose tort liabilities upon the psychiatrists at the VA hospital for a mistake in not seeking involuntary commitment. The state legislature is the primary declarant of North Carolina's public policy; it is most unlikely that the North Carolina Supreme Court would stretch and distort established tort doctrine to impose tort liabilities for simple negligence on the part of the VA psychiatrists when the legislature had declared the state's policy of going in the other direction. Established doctrine would permit recovery for negligence in the release of a previously committed person known to be dangerous, but the legislature provided qualified immunity even in that situation; in this case, the plaintiff can find little comfort in generally accepted doctrine and the legislative provision of special protections, even for those subject to liability under established doctrine, strongly suggests the North Carolina courts would not sanction any great enlargement of that doctrine.
 
 
 31
 We share the regret expressed by the district judge that North Carolina has no certification statute. This is the kind of case which should be certified by a federal court to the State Supreme Court for resolution of the pure question of state law. Without such a statute, we must decide the case, attempting, as best we can, to divine what North Carolina's Supreme Court would do in answer to the question, had it been properly brought before that court.
 
 III.
 
 32
 While we have not followed the same road as the district court, we have come to the same destination.
 
 
 33
 AFFIRMED.
 
 
 
 [1]
 Had the psychiatrists at the Veterans Administration hospital sought to have Avery committed involuntarily and the court had found him subject to such commitment, there would be substantial doubt that the commitment would be to the Veterans Administration hospital. The openly adversarial position of the psychiatrists would probably have evoked undue antagonisms on Avery's part with the result that the committing authority may well have sought and preferred commitment to another institution