IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA16-554

Filed: 15 August 2017

Buncombe County, No. 14 CVS 5473

ARTHUR MCARDLE, KIMBERLY MCARDLE, SELDON JONES, JACOB MCARDLE, HANNAH MCARDLE, BANNING MCARDLE, and FREDERICK S. BARBOUR as Guardian ad Litem for SOPHIE MCARDLE, Plaintiffs,

v.

MISSION HOSPITAL, INC. and MISSION HEALTH SYSTEM, INC., Defendants.

Appeal by Plaintiffs from Order entered 21 January 2016 by Judge William H. Coward in Buncombe County Superior Court. Heard in the Court of Appeals 29 November 2016.

*Twiggs, Strickland & Rabenau, by Donald R. Strickland, Karen M. Rabenau, and Katherine A. King, for Plaintiffs-Appellants.*

*Roberts & Stevens, P.A., by Phillip T. Jackson and Eric P. Edgerton, and Patla, Straus, Robinson & Moore, P.A., by Richard S. Daniels, for Defendants-Appellees.*

INMAN, Judge.

> [C]ompassion is a natural feeling . . . that hurries us without reflection to the relief of those who are in distress: it is this which in a state of nature supplies the place of laws, morals and virtues . . . . [T]he origin of society and law . . . irretrievably destroyed natural liberty . . . and serve as a substitute for natural compassion, which lost, when applied to societies, almost all the influence it had over

> individuals . . . . The people having in respect of their social relations concentrated all their wills in one, . . . becom[ing] so many fundamental laws, obligatory on all the members of the State without exception, and one of these articles regulates the choice and power of the magistrates appointed to watch over the execution of the rest.

Jean-Jacques Rousseau, *A Discourse on the Origin and Basis of Inequality, in The Social Contract & Discourses by Jean-Jacques Rousseau* 155, 199-228 (G. D. H. Cole trans., London, J. M. Dent & Sons Ltd., 1913) (1754).

> "[E]very law is universal, and there are some things about which it is not possible to speak rightly when speaking universally."

Aristotle, *Nicomachean Ethics* 100 (Joe Sachs trans. 2002).

When a respondent in an involuntary commitment proceeding is delivered to a hospital or other facility for an initial examination to recommend whether commitment without the respondent's consent is required, neither the examiner nor the hospital or other facility obtains custody or a legal right to control the respondent unless and until involuntary commitment is recommended by the examiner. For this reason, neither the examiner nor the facility owes a duty to third parties for harm resulting from an examiner's recommendation against involuntary commitment, even if the examination failed to comply with statutory requirements.

Arthur and Kimberly McArdle and their five surviving children (collectively "the McArdles") appeal a trial court's order of 21 January 2016 denying their motion to amend their complaint as futile and granting a motion to dismiss by Mission

Hospital, Inc. and Mission Health System, Inc. (collectively "Defendants") on the basis that Defendants owed the McArdles no legal duty. We affirm.

## I. Background and Procedural History

The McArdles' complaint and proposed amended complaint include the following allegations:

Joshua McArdle ("Joshua"), now deceased, was diagnosed with post-traumatic stress disorder (PTSD) after serving a tour of duty in a hostile area of Iraq as a United States Marine. He received an "Other than Honorable" discharge from the Marine Corps in 2008 due to drug abuse, which precluded him from receiving subsequent care through the Veterans Administration (VA). After discharge, Joshua received no mental health or substance abuse treatment. He abused alcohol, cocaine, Percocet, and marijuana, experienced extreme paranoia, and amassed a personal arsenal of weapons and ammunition.

The McArdles and other family members, including Joshua, gathered in Asheville, North Carolina in the days preceding the planned wedding of Joshua's sister Seldon Jones ("Seldon"), née McArdle, on 11 May 2013. During the pre-wedding gathering Joshua engaged in episodes of violence on 7 and 8 May 2013, including: (1) choking his brother Banning McArdle ("Banning") while Banning was driving, after Banning refused to take Joshua to buy drugs; (2) entering his brother Jacob McArdle's ("Jacob") house at night and awakening and beating Jacob; and (3)

attempting to break down the door of his parents' house and again attacking Jacob. Joshua also threatened to beat up his biological father when he arrived in town for the wedding. During the altercation at the family home on the morning of 8 May 2013, Seldon called 911. Sheriff's deputies arrived at the home shortly after Joshua left.

One of the responding deputies suggested that, rather than having Joshua arrested, the family should instead pursue involuntary commitment. The McArdles all agreed on this course of action, and Arthur McArdle executed an Affidavit and Petition for Involuntary Commitment (the "Petition") before the Buncombe County Assistant Clerk of Superior Court on the same morning. Arthur's Petition sought involuntary commitment of Joshua on the grounds that he was: (1) mentally ill and dangerous to self or others and in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness; and (2) a substance abuser and dangerous to self or others.

The Buncombe County Assistant Clerk of Superior Court issued a Findings and Custody Order for Involuntary Commitment (the "Custody Order") on 8 May 2013 finding reasonable grounds to believe that the allegations in the Petition were true and directing law enforcement officers to take Joshua into custody for an initial examination ("First Examination") as required by N.C. Gen. Stat. §§ 122C-263 and

122C-283.[1]  The Buncombe County Sheriff's Department took Joshua into custody and delivered him to Mission Hospital at 1:45 p.m. on the same day.

At approximately 3:30 p.m. on 8 May 2013, nursing staff in Mission Hospital's Emergency Department noted initial observations that Joshua appeared "Anxious" with "Impaired Focus/Concentration" and that he "Denies suicidal ideation/homicidal ideation at present" and "Minimizes problem."  At approximately 4:25 p.m., Mission Hospital emergency medicine physician James Roberson, M.D. ("Dr. Roberson") referred Joshua to the hospital's psychiatric unit for the required First Examination.

In the psychiatric unit at 4:40 p.m., a Patient/Family Services Consult was performed by clinical social worker David Weiner, who indicated in Joshua's hospital chart that:

> [t]he patient is under community petition by his father. The petition was due to a physical altercation with his brother wherein the patient tried to strangle him.  The patient denies the severity of this altercation.  The patient's family reports that the patient is an ex-Marine and might be struggling with PTSD.  Patient to be assessed by next available PC.

Subsequently on 8 May 2013, Dina Paul ("Paul"), a licensed clinical social worker and employee of Defendants, conducted an examination of Joshua. **[*Id.*]** Paul

---

[1] While these statutes do not explicitly term the examinations performed thereunder as "First Examinations," both N.C. Gen. Stat. §§ 122C-263 (2015) and 122C-283 (2015) are titled "Duties of law-enforcement officer; first examination by physician or eligible psychologist."  In the interest of brevity, a reference to a "First Examination" in this opinion shall refer to an examination under either of these statutes unless specifically stated otherwise.

interviewed Joshua and also received statements from several family members, including Arthur, Banning, and Jacob. Paul was apprised of Joshua's alcohol and marijuana use, a drug screen testing positive for cannabinoids, his "Other than Honorable" discharge from the Marine Corps for drug abuse, his lack of current VA benefits, and Joshua's acknowledgment of anger issues since returning from Iraq and his desire for treatment for PTSD. Paul wrote an Evaluation report to Dr. Roberson recommending against inpatient commitment for Joshua. Paul's report concluded that "[Patient] can benefit from return to home with referral to VA for help with benefits and therapy. [Patient] in agreement with these recommendations."

The McArdles allege Paul was not qualified by statute or regulation to perform the First Examination.

After discussion with Paul, Dr. Roberson signed the North Carolina Department of Health and Human Services form entitled "Examination and Recommendation to Determine Necessity for Involuntary Commitment" (the "Recommendation"), indicating that Joshua did not meet the criteria for inpatient commitment. The Recommendation stated that Joshua was "able at this time to contract for safety – denies suicidal ideation and homicidal ideation with no psychotic symptoms. He has strong social supports, gainful employment. No psychiatric history." Rather than indicating that Joshua was mentally ill and/or a substance abuser and dangerous to himself or others, the Recommendation noted that Joshua

was "none of the above." It further stated that "[t]he brothers reported they do not feel that the patient is a danger to anyone else or himself" but did not mention that Arthur had expressed the concern to Paul that Joshua was a danger to himself and others. The Recommendation included the note that Joshua "is in the process of getting care established at the VA medical center" without addressing Joshua's eligibility for such benefits, which is discretionary for one discharged under "Other than Honorable" conditions. Mission Hospital discharged Joshua at approximately 10:09 p.m. on 8 May 2013, without notifying the McArdles.

Three nights later, at approximately 1:20 a.m. on 11 May 2013, Joshua broke into the McArdle family residence.[2] He shot and severely wounded Banning and Arthur before fatally shooting himself in the head. When Joshua shot himself, his body fell on his mother Kimberly, breaking her leg. Sisters Seldon, Hannah, and Sophie witnessed the shootings and their aftermath. After learning of the incident, Jacob rushed to Mission Hospital where he witnessed Arthur and Banning being treated for life-threatening injuries.

The McArdles filed suit on 29 December 2014 alleging negligence, gross negligence, and negligent infliction of emotional distress arising from the acts and omissions of Defendants and their employees in the First Examination. Defendants

---

[2] A toxicology report indicated that at the time of Joshua's death his blood alcohol content was .103 g/DL.

filed their answer and motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure on 9 March 2015. The McArdles filed a motion to amend their complaint on 23 November 2015, and the trial court heard both Defendants' motion to dismiss and the McArdles' motion to amend on 30 November 2015. On 21 January 2016, the trial court entered its order granting the motion to dismiss and denying the motion to amend as futile, holding that Defendants owed the McArdles no legal duty. The McArdles timely appealed.

## II. Analysis

We review a denial of a motion to amend for abuse of discretion. *Martin v. Hare*, 78 N.C. App. 358, 361, 337 S.E.2d 632, 634 (1985). A dismissal under Rule 12(b)(6), by contrast, is reviewed *de novo*. *Holleman v. Aiken*, 193 N.C. App. 484, 491, 668 S.E.2d 579, 585 (2008). In applying such a standard, the issue before the appellate court:

> is whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory. The complaint must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief.

*Block v. County of Person*, 141 N.C. App. 273, 277-78, 540 S.E.2d 415, 419 (2000) (internal citations and quotation marks omitted). However, "conclusions of law or

unwarranted deductions of fact are not admitted." *Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970) (internal quotation marks omitted).

The trial court dismissed the McArdles' complaint and denied their motion to amend for futility on the basis that no set of facts or circumstances "would support a finding that the Defendants owed the Plaintiffs any legally recognized duty . . . ." We must therefore determine whether Defendants, in conducting their First Examination of Joshua, owed a legal duty to the McArdles as third parties.[3] In resolving this question, we first review our state's common law concerning duties to third parties and then determine whether, under the statutory scheme for involuntary commitments set forth in N.C. Gen. Stat. §§ 122C-261 and 122C-281 *et seq.*, liability for the McArdles' injuries can arise from Defendants' First Examination.

*A. Common Law Liability for Breach of Duty to Third Parties*

"In general, there is neither a duty to control the actions of a third party, nor to protect another from a third party." *Scadden*, N.C. App. at 802, 733 S.E.2d at 92 (citing *King v. Durham Cnty. Mental Health Developmental Disabilities and*

---

[3] The case authorities cited in this opinion use the terms "third persons" or "third parties" to refer to either the actor whose wrongful acts directly caused injury to a litigant or, alternatively, to the litigant claiming injury by said wrongful acts. *Compare Scadden v. Holt*, 222 N.C. App. 799, 802, 733 S.E.2d 90, 92 (2012) ("In general, there is neither a duty to control the actions of a third party, nor to protect another from a third party.") *with Davis v. N. C. Dept. of Human Resources*, 121 N.C. App. 105, 113, 465 S.E.2d 2, 7 (1995) ("Rivers was involuntarily committed into defendant's custody and it, therefore, had a duty to exercise reasonable care in the protection of third parties from injury by Rivers."). Because both parties in this action adopted the latter usage in their briefs by referring to Plaintiffs as the third parties in the tort analysis, we do the same except when quoting other courts' opinions.

*Substance Abuse Auth.*, 113 N.C. App. 341, 345, 439 S.E.2d 771, 774, *disc. rev. denied*, 336 N.C. 316, 445 S.E.2d 396 (1994)). There is, however, "an exception to the general rule . . . where there is a special relationship between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct . . . ." *Hedrick v. Rains*, 121 N.C. App. 466, 469, 466 S.E.2d 281, 283-84, *aff'd per curiam*, 344 N.C. 729, 477 S.E.2d 171 (1996) (internal citations omitted).

> A finding that a special relationship exists and imposes a duty to control is justified where "(1) the defendant knows or should know of the third person's violent propensities *and* (2) the defendant has the ability and opportunity to control the third person at the time of the third person's criminal acts."

*Scadden¸* 222 N.C. App. at 803, 733 S.E.2d at 93 (emphasis added in original) (quoting *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 330, 626 S.E.2d 263, 269 (2006)). "The ability and opportunity to control must be more than mere physical ability to control. Rather, it must rise to the level of custody, or legal right to control." *Scadden*, 222 N.C. App. at 803, 733 S.E.2d at 93.

This Court has held that a special relationship exists when an individual is involuntarily committed, negligently released by the defendant, and the negligent release proximately results in harm to a third-party plaintiff. *See, e.g., Pangburn v. Saad*, 73 N.C. App. 336, 338-39, 326 S.E.2d 365, 367-68 (1985) (holding a duty to third parties existed where plaintiff alleged that defendant negligently released an involuntarily committed patient who then stabbed plaintiff approximately 20 times);

*Davis*, 121 N.C. App. at 113, 465 S.E.2d at 7 ("Rivers was involuntarily committed into defendant's custody and it, therefore, had a duty to exercise reasonable care in the protection of third parties from injury by Rivers."); *Gregory v. Kilbride*, 150 N.C. App. 601, 607, 565 S.E.2d 685, 690 (2002) ("[A]n independent duty arises to protect third persons from harm by the release of a mental patient who is involuntarily committed." (citation omitted)). But we have not held that such a duty to third parties existed when a voluntarily committed mental patient was released. *See King*, 113 N.C. App. at 346-47, 439 S.E.2d at 775 (holding that an individual's voluntary participation in the Willie M. program, though it obligated the defendants to provide services, did not confer upon defendants custody over the individual or the ability to control him absent a "court order").

In a related line of cases cited favorably by this Court, the Fourth Circuit's appellate and district courts have interpreted North Carolina law to hold that this State does not recognize an affirmative duty on the part of psychiatric care providers to seek involuntary commitment for individuals. *See Currie v. U.S.*, 836 F.2d 209, 214 (4th Cir. 1987) ("[I]t [is] most unlikely that the North Carolina Supreme Court would hold that North Carolina's public policy and its tort law would impose tort liabilities upon the psychiatrists at the VA hospital for a mistake in not seeking involuntary commitment."); *Cantrell v. U.S.*, 735 F. Supp. 670, 673 (E.D.N.C. 1988) ("North Carolina law d[oes] not impose an affirmative duty on mental health

professionals to seek an involuntary commitment of a patient." (citing *Currie* at 212));

*Davis*, 121 N.C. App. at 112, 465 S.E.2d at 7 (citing *Currie* at 212-13); *King*, 113 N.C.

App. at 347, 439 S.E.2d at 775 (citing *Cantrell* at 673).

While case law provides guidance as to the duty (or lack thereof) of mental healthcare providers to third parties prior to the commencement of involuntary commitment procedures, after involuntary commitment, and where an individual has been voluntarily committed, the issue of whether a special relationship creating a duty to third parties exists in the pre-commitment stages of an involuntary commitment proceeding is one of first impression.

The narrow question before this Court is whether, at the First Examination prior to a recommendation of involuntary commitment, a defendant examining a respondent has "custody, or [a] legal right to control" the respondent and therefore owes a duty to third parties. *Scadden*, 222 N.C. App. at 803, 733 S.E.2d at 93. The McArdles argue that "custody" and "legal right to control" are distinct, such that one party may be vested with the former and another with the latter. Assuming *arguendo* that such a distinction exists, we are required to examine our involuntary commitment statutes alongside the Custody Order in this case to determine whether "custody, or [a] legal right to control" was ever vested in Defendants. *Id.* at 803, 733 S.E.2d at 93.

B. *Custody, Control, and the Involuntary Commitment Statutory Scheme*

Arthur McArdle instituted Joshua's involuntary commitment proceeding by executing an Affidavit and Petition for Involuntary Commitment under both N.C. Gen. Stat. §§ 122C-261 *et seq.* (2015) (allowing for the involuntary commitment of the mentally ill) and N.C. Gen. Stat. §§ 122C-281 *et seq.* (2015) (allowing for the involuntary commitment of substance abusers). Under both N.C. Gen. Stat. §§ 122C-261 and 122C-281, a clerk or magistrate "shall issue an order to a law enforcement officer or any other person authorized . . . to take the respondent into custody for examination by a physician or eligible psychologist" upon finding reasonable grounds that the facts alleged in the affidavit are true and the respondent is probably mentally ill (under N.C. Gen. Stat. § 122C-261(b)) or a substance abuser (under N.C. Gen. Stat. 122C-281(b)), and that the individual is a danger to himself or others.[4] N.C. Gen. Stat. § 122C-261(b); *see also* N.C. Gen. Stat. § 122C-281(b) (using virtually identical language). Upon receipt of such an order under either statute, "a law enforcement officer or other person designated in the order shall take the respondent into custody within 24 hours after the order is signed . . . ." N.C. Gen. Stat. § 122C-261(e); s*ee also* N.C. Gen. Stat. § 122C-281(e) (using virtually identical language).

Once a respondent is in the custody of a law enforcement officer or other properly designated individual, N.C. Gen. Stat. §§ 122C-263(a) and 122C-283(a)

---

[4] We acknowledge that a clerk or magistrate shall also issue a custody order under N.C. Gen. Stat. § 122C-261(b) upon finding it probable that the individual is mentally ill and needs treatment to avoid deterioration leading to predictable dangerousness.

require that the respondent be transported to an "area facility for examination by a physician or eligible psychologist; if a physician or eligible psychologist is not available in the area facility, the person designated to provide transportation shall take the respondent to any physician or eligible psychologist locally available." N.C. Gen. Stat.§ 122C-263(a); *see also* N.C. Gen. Stat. § 122C-283(a) (using virtually identical language). If neither option is available, "the respondent may be temporarily detained in an area facility," and, failing that, "the respondent may be detained under appropriate supervision in the respondent's home, in a private hospital or clinic, in a general hospital, or in a State facility for the mentally ill, but not in a jail or other penal facility." N.C. Gen. Stat. § 122C-263(a); *see also* N.C. Gen. Stat. § 122C-283(a).[5]

Upon "present[ation] for examination" by the respondent's custodian to a physician or eligible psychologist, N.C. Gen. Stat. §§ 122C-263(c) and 122C-283(c) require that said physician or eligible psychologist conduct a First Examination. N.C. Gen. Stat. § 122C-263(c) requires, at a minimum, an examination of the respondent's current and prior history of mental illness or retardation, his or her dangerousness to self or others under N.C. Gen. Stat. § 122C-3(11), his "[a]bility to survive safely without inpatient commitment," and his capacity to make decisions concerning his

---

[5] The precise language of N.C. Gen. Stat. § 122C-283(a) (involuntary commitment for substance abuse) differs from the above-quoted language of N.C. Gen. Stat. § 122C-263(a) (involuntary commitment for mental illness) only in respect to the pronouns used and the omission of the clause pertaining to state mental health facilities.

care. The First Examination for involuntary commitment for substance abuse is similar, requiring the examiner to review the respondent's "[c]urrent and previous substance abuse" and to determine if the respondent is dangerous to himself or others. N.C. Gen. Stat. § 122C-283(c).

Depending on the evaluation of the necessary factors in a First Examination, the involuntary commitment statutes dictate certain discrete outcomes: inpatient commitment, outpatient commitment, or a termination of proceedings and a release from custody by law enforcement or other properly designated individual. N.C. Gen. Stat. §§ 122C-263(d) and 122C-283(d). The medical provider conducting a First Examination must make certain findings, and, depending on the findings, the statutes compel either commitment (inpatient or outpatient) or release. N.C. Gen. Stat. §§ 122C-263(d) and 122C-283(d). The statutes provide for no additional alternative results. An examiner does not have discretion, for example, to release a respondent to an outpatient provider after making findings that, by statutory mandate, require inpatient commitment.[6]

---

[6] The statutes are less constraining on a course of treatment that a district court can order following examinations recommending involuntary commitment. For example, N.C. Gen. Stat. § 122C-271(b)(2) states that a court "*may* order inpatient commitment" for mentally ill individuals who are dangerous to self or others, and it "*may also* [order such a respondent] be committed to a combination of inpatient and outpatient commitment . . . ." (emphasis added). This is in contrast to the statutory requirement in the same subsection that "[i]f the court does not find that the respondent meets either of the commitment criteria . . . , the respondent *shall* be discharged." N.C. Gen. Stat. § 122C-271(b)(3) (emphasis added). In cases of involuntary commitment for substance abuse, the trial court does not actually determine whether inpatient or outpatient treatment is appropriate; rather, if the court orders commitment pursuant to the statute, N.C. Gen. Stat. § 122C-287, "[t]he area authority or

If inpatient commitment is compelled by findings made by an examiner, the respondent is delivered by law enforcement or other properly designated individual to a "24-hour facility described in [N.C. Gen. Stat. §] 122C-252 [titled 'Twenty-four hour facilities for custody and treatment of involuntary clients']." N.C. Gen. Stat. §§ 122C-263(d)(2) and 122C-283(d)(1). When a 24-hour facility is not available or appropriate for the medical care of a mentally ill respondent, the respondent "may be temporarily detained under appropriate supervision at the site of the first examination[;]" if, after seven days of temporary detention, no 24-hour facility becomes available or such a facility is no longer appropriate, the involuntary commitment proceedings are terminated. N.C. Gen. Stat. § 122C-263(d)(2). If proceedings are terminated, a respondent in a mental illness commitment proceeding is to be returned by law enforcement or an individual properly designated to his home or that of another consenting person and "the respondent shall be released from custody." N.C. Gen. Stat. § 122C-263(d)(3). Upon termination of proceedings in a substance abuse case, the statute simply states that "the respondent shall be released . . . ." N.C. Gen. Stat. § 12C-283(d)(2). In such circumstances, no involuntary

---

physician . . . may prescribe or administer [the commitment] . . . either on an outpatient basis or in a 24-hour facility." N.C. Gen. Stat. § 122C-290(a). This permissive language is entirely absent from the statutes concerning First Examinations, which instead employ the mandatory "*shall* recommend," with outcomes dictated by whether the required findings are found in the positive or negative, and there is no provision allowing for a recommendation of a combination of inpatient and outpatient commitment in a First Examination. N.C. Gen. Stat. §§ 122C-263(d) and 122C-283(d) (emphasis added). In a First Examination for substance abuse, the examiner must recommend commitment upon the finding of certain factors, but in doing so may allow the respondent to "be released or be held at a 24-hour facility pending hearing . . . ." N.C. Gen. Stat. § 122C-283(d)(1).

commitment occurs. *Waldron v. Batten*, 191 N.C. App. 237, 241, 662 S.E.2d 568, 570 (2008) (holding that where a First Examination is administered to a respondent and no commitment is recommended, no involuntary commitment occurs).

The involuntary commitment statutes positively grant custody at the First Examination stage only to law enforcement or another properly designated individual by order of the clerk pursuant to N.C. Gen. Stat. §§ 122C-261(b) and 122C-281(b). Under those statutes, "the clerk or magistrate shall issue an order to a law enforcement officer or any other person authorized under G.S. 122C-251 to take the respondent into custody for examination . . . ." N.C. Gen. Stat. § 122C-261(b); *see also* N.C. Gen. Stat. § 122C-281(b). Taking the McArdles' allegations as true, the Custody Order issued in this case did exactly that; it directed the Buncombe County Sheriff's Department to "take [Joshua] into custody within 24 hours after this order is signed and take [him] for examination by a person authorized by law to conduct the examination." (internal quotation marks omitted).

Following issuance of such an order and "[w]ithout unnecessary delay after assuming custody, the law enforcement officer . . . shall take the respondent . . . for examination by a physician or eligible psychologist . . . ." N.C. Gen. Stat. § 122C-263(a); *see also* N.C. Gen. Stat. § 122C-283(a).[7] No language in these statutes shifts

---

[7] We note that these statutes impose the duty on law enforcement (or another properly designated individual) to deliver the individual to a properly qualified examiner or, failing that, to temporarily detain him until such delivery can be accomplished. N.C. Gen. Stat. §§ 122C-263(a) and

custody from law enforcement to the examiner (or anyone else) in a First Examination; indeed, the First Examination in a mental illness proceeding may even be conducted via "telemedicine" outside the examiner's physical presence. N.C. Gen. Stat. § 122C-263(c). As far as the import of the location of the First Examination is concerned, we note that the involuntary commitment statutes have specifically delineated between "24-hour facilities . . . for the *custody* and treatment of involuntary clients[,]" N.C. Gen. Stat. § 122C-252 (2015) (emphasis added), and other locations for evaluations and examinations. Notably, there is no requirement that the First Examination be conducted at such a facility.[8]

A plain reading of the statutes' language demonstrates that, following a First Examination, custody continues with law enforcement until the respondent is, in

---

122C-283(a). Indeed, the proposed amended complaint in this case specifically alleges that the Custody Order ordered the Buncombe County Sheriff's Office to "take [Joshua] into custody within 24 hours after this order is signed and take the respondent for examination *by a person authorized by law to conduct the examination*." (internal quotation marks omitted) (emphasis added). It also alleges that, upon delivery of an involuntary commitment respondent to Mission Hospital, a Buncombe County Sheriff's deputy typically fills out a Return of Service section in the Findings and Custody Order acknowledging that " 'the respondent was *presented to an authorized examiner*' and providing the . . . Name of Examiner . . . ." (emphasis added). The proposed amended complaint further alleges that the Buncombe County Sheriff's deputy filled out this form when he dropped off Joshua at 1:45 p.m. and left, but that Joshua was not referred to the psychiatric unit until 4:25 p.m. Per the statute and as alleged in the proposed amended complaint, the Buncombe County Sheriff's Department failed to deliver Joshua to a qualified examiner or to detain him until such an examiner was available. We do not consider the Buncombe County Sheriff's Department's potential liability, however, as it is not a party to this action.

[8] The statutes contemplate that the First Examination can occur in a host of locations that may or may not be capable of assuming custody, including "in the respondent's home, in a private hospital or a clinic, in a general hospital, or in a State facility for the mentally ill, but not in a jail or other penal facility." N.C. Gen. Stat. § 122C-263(a); *see also* N.C. Gen. Stat. § 122C-283(a) (providing similar locations).

cases recommending commitment, transferred to a 24-hour facility "for the custody and treatment of involuntary clients[,]" N.C. Gen. Stat. § 122C-252, or, in cases where commitment is not recommended, returned to a residence and "released from custody." N.C. Gen. Stat. §§ 122C-263(d); *see also* N.C. Gen. Stat. § 122C-283(d). It necessarily follows that the Buncombe County Sheriff's Department assumed custody of Joshua pursuant to the Custody Order and the applicable statutes until he was delivered to a 24-hour facility on a recommendation of commitment or, in the alternative, transported to his home or the home of a consenting individual following the termination of the proceeding. Because Defendants did not assume custody of Joshua under the statutory scheme, it cannot serve as the basis of a special relationship creating a duty to third parties. *See, e.g., Scadden*, 222 N.C. App. at 803, 733 S.E.2d at 93 (noting the requirement of "custody, or legal right to control.").

This reading of the statutes comports with our legislature's enactment of Session Law 2013-114 , which specifically granted facilities in Ashe, Cumberland, and Wilkes Counties the ability to detain, pursue, and return individuals in the course of a First Examination *in the place of* law enforcement. 2013 N.C. Sess. Laws 235-36. Presuming as we must that our legislature passed Session Law 2013-114 with full knowledge of the involuntary commitment scheme, *Dickson v. Rucho*, 366 N.C. 332, 341, 737 S.E.2d 362, 369 (2013), and acknowledging the limitation of its effect to only three counties, its enactment confirms our conclusion that the

legislature has not seen fit, as a general matter, to confer custody of an involuntary commitment respondent on anyone other than law enforcement or other person properly designated by the clerk or magistrate prior to and during a First Examination.

Beyond custody, the McArdles assert several well-stated arguments that the involuntary commitment scheme bestowed upon Defendants a legal right to control Joshua irrespective of custody. Assuming *arguendo* that there is a distinction between "custody" and "legal right to control," we nonetheless ultimately find the McArdles' arguments unavailing.

The McArdles argue that because "Defendants had the legal right to: (1) Retain Joshua in their 24-hour facility [by recommending involuntary commitment for mental illness] . . . ; and/or (2) Retain Joshua in their 24-hour facility [by recommending involuntary commitment for substance abuse,]" they had the legal right to control Joshua, creating a special relationship subjecting Defendants to liability to third persons. The McArdles argue that Defendants therefore "ha[d] the legal right to mandate that Joshua continue to remain restrained, [and] the corresponding positive duty to [decide] under [N.C. Gen. Stat.] § 122C-263(d) whether to further restrain or release." In advocating for the existence of the positive duty and legal right to mandate Joshua's restraint, the McArdles rightly note that the compulsory "shall" verbiage employed in N.C. Gen. Stat. § 122C-263(d) concerning

the required findings in a First Examination is "the classic language of duty." *See McLean v. Sale*, 38 N.C. App. 520, 523, 248 S.E.2d 372, 374 (1978) (holding that the use of "shall" in an earlier incarnation of North Carolina's involuntary commitment statute "imposes a positive duty on the defendant to make the examination . . . ."). However, we hold that the nature of the duty imposed, in light of the particulars of the statutory scheme, is insufficient to impose a "special relationship" between Defendants and the McArdles.

N.C. Gen. Stat. § 122C-263(d) imposes a statutory duty on Defendants, insofar as the examiner in a First Examination "shall make the following determinations . . . ." The duty's mere existence, however, does not mean that it extends beyond Joshua to third parties.

This Court has previously held that "N.C.G.S. § 122C-263 and the related involuntary commitment statutes are not public safety statutes." *Kilbride*, 150 N.C. App. at 610-11, 565 S.E.2d at 692. The duties provided in these statutes are intended to protect the due process rights of the respondent, not the safety of the public. *Id.* at 610-11, 565 S.E.2d at 692 ("The primary purpose of an involuntary commitment proceeding is to protect the person who, *after due process*, has been found to be both mentally ill and imminently dangerous . . . . The purpose of the statutes is . . . to protect the rights of the individual who is the subject of the involuntary commitment proceedings." (emphasis added) (internal citations omitted)).

Defendants had no right to control Joshua at the time of the alleged breach of duty to Joshua because it occurred prior to his admission to Defendants' care. The McArdles contend that the examiner's statutory authority to make findings about an involuntary commitment petition respondent means "[t]he power to release or not release is the first examiner's[.]" But the examiner has no discretion whether or not to release a respondent. It is the *statutes* that dictate the result on the basis of the examiner's findings, and the examiner is not authorized by law to deviate from those statutorily-imposed results. Nor may the examiner assume control over the respondent. In short, a right or duty to make a determination that may result in assuming a legal right to control is distinct from the legal right to control itself, and Defendants " 'had no legal right to mandate' [Joshua's] behavior" because the statutory mandate for commitment was never triggered. *Scadden*, 222 N.C. App. at 805-06, 733 S.E.2d at 94 (quoting *King*, 113 N.C. App. at 347, 439 S.E.2d at 775).[9] While it is true that "[i]t is the finding by the physician . . . that directly results in the restraint of respondent[,]" *McLean*, 38 N.C. App. at 523, the examiner at a First

---

[9] A similar line was drawn in *Cantrell*. 735 F. Supp. at 673. There, the federal district court noted that although a mental health provider may, under N.C. Gen. Stat. § 122C-212(b), hold a voluntarily committed patient for 72 hours following a request for discharge, this ability did not rise to level of control sufficient to create a special relationship imposing liability to third parties. *Id.* at 673. Instead, the provider's ability to hold an individual for 72 hours merely "enables the institution to *attempt* to gain control which *it does not have over the patient* by seeking involuntary commitment." *Id.* at 673 (emphasis added).

Examination is empowered only to make certain findings, and it is only after specific findings are made that control is exercised.[10]

Application of our law to the McArdles' logic aptly demonstrates this distinction. N.C. Gen. Stat. § 122C-262(a) provides: "*Anyone* . . . who has knowledge of an individual who is subject to inpatient commitment . . . and who requires immediate hospitalization to prevent harm to self or others, may transport the individual directly to an area facility or other place [for a First Examination] . . . ." N.C. Gen. Stat. § 122C-262(a) (emphasis added). A person may take control of such a person absent an order for custody under N.C. Gen. Stat. § 122C-261. *See In re Woodie*, 116 N.C. App. 425, 429, 448 S.E.2d 142, 144 (1994) (holding there was no error in an involuntary commitment action where police transported an individual to a hospital for examination by a physician under N.C. Gen. Stat. § 122C-262 "without having a petition for an order to take appellant into custody in the court file as required by [N.C. Gen. Stat.] § 122C-261 (1993)."). Thus, under particular circumstances, any member of the public may have the statutorily-provided option of exercising a degree of control over a person that is equivalent to, and otherwise reserved for, a custody order under the involuntary commitment statutes. If we were to hold, as the McArdles' logic dictates, that "custody, or [a] legal right to control[,]"

---

[10] We note that the pleadings in this matter also identify this distinction: the specific factual allegations of negligence in the McArdles' original and amended complaints pertain to actions or omissions in the *First Examination itself* rather than in the exercise of any positive control over Joshua.

*Scadden*, 222 N.C. App. at 803, 733 S.E.2d at 93, is equivalent to "the legal ability" to assume the mantle of a legal right to control, then *any* person electing not to transport an individual consistent with N.C. Gen. Stat. § 122C-262(a) would fall within the "special relationship" giving rise to liability to others, if the person, per the very terms of N.C. Gen. Stat. § 122C-262, knew of the individual's "violent propensities and . . . ha[d] the ability and opportunity to control" the individual. *Stein*, 360 N.C. at 330, 626 S.E.2d at 269. Such a holding would upend the general rule that "there is neither a duty to control the actions of a third party, nor to protect another from a third party." *Scadden*, 222 N.C. App. at 802, 733 S.E.2d at 92; *see also Currie*, 836 F.2d at 214 ("[I]t [is] most unlikely that the North Carolina Supreme Court would hold that North Carolina's public policy and its tort law would impose tort liabilities upon the psychiatrists at the VA hospital for a mistake in not seeking involuntary commitment.") *and Cantrell*, 735 F. Supp. at 672-73 ("North Carolina law d[oes] not impose an affirmative duty on mental health professionals to seek an involuntary commitment of a patient." (citing *Currie*, 836 F.2d at 212)). We therefore decline to adopt the holding advocated by the McArdles to prevent "the exception [from] swallow[ing] the rule . . . ." *Scadden*, 222 N.C. App. at 803, 733 S.E.2d at 93. The exception creating liability to claims by third parties in the involuntary commitment context remains unchanged: "[W]here a person *has been involuntarily committed* . . . there is a duty on the institution to exercise control over the patient .

. . ." *Davis*, 121 N.C. App. at 112, 465 S.E.2d at 7 (emphasis added); *see also King*, 113 N.C. App. at 346, 439 S.E.2d at 774 (noting the exception applies in "institution-involuntarily committed mental patient" cases).

For the same reason that we affirm the trial court's conclusion that Defendants owed no duty to the McArdles, we also affirm the trial court's denial of the McArdles' motion to amend the complaint, because the complaint could not be amended to state a valid cause of action against Defendants.

### III.  Conclusion

The McArdles' original and proposed amended complaints chronicle a terrible series of events and profound suffering.  Even so, our sympathy does not empower us to step beyond the confines of the law: "Absent legal grounds for visiting civil liability on defendant[s], our courts cannot offer plaintiffs the requested remedy."  *Stein*, 360 N.C. at 325, 626 S.E.2d at 266.  Because we hold that Defendants did not have custody of or a legal right to control Joshua when conducting their First Examination, no special relationship was created imposing liability, and the trial court did not abuse its discretion in denying the McArdles' motion to amend or commit reversible error in dismissing their complaint.

AFFIRMED.

Judges CALABRIA and ZACHARY concur.